Curtis W. HANKS, Plaintiff, Appellant
and Appellee on Cross–Appeal,

v.

Margaret HANKS, Defendant, Appellee
and Appellant on Cross–Appeal.

Nos. 12744, 12745.

Supreme Court of South Dakota.

Argued Feb. 27, 1980.

Decided Sept. 3, 1980.

Rehearing Denied Oct. 10, 1980.

John R. Kabeiseman of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, for plaintiff, appellant and appellee on cross–appeal.

William Taylor of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant, appellee and appellant on cross–appeal.

MORGAN, Justice.

This appeal and cross–appeal goes to every facet of the decree of divorce entered herein in favor of Curtis W. Hanks (appellant) and against Margaret Hanks (appellee), which decree also awarded custody of

their minor children to appellee and set child support payments, divided the property of the parties, and awarded appellee alimony payments for life. Appellant contests the custody, support, property division, and alimony provisions. Appellee contests the award of the decree to appellant, the support, property division, and alimony provisions. We affirm in part, reverse in part, and remand.

The parties were married in 1958 while both were students at the University of South Dakota in Vermillion. Upon graduation from law school in January of 1962, appellant returned to his home town of Lemmon, South Dakota, and set up a law practice. Appellee remained in Vermillion to complete her degree, which she did by August of 1962 whereupon she, too, moved to Lemmon. Four children were born as issue of the marriage, the oldest being eighteen and the youngest eight at the time of the divorce trial.[1] The award of the decree to appellant was based on the trial court's finding that appellee was guilty of an adulterous relationship with one Robert Seeley. The problems that led to the divorce court will be discussed where appropriate to our disposition of the various issues.

Upon this court's review of the trial court's findings, due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses and to weigh their testimony, and the court's findings will not be set aside unless they are clearly erroneous. SDCL 15–6–52(a); *Spaulding v. Spaulding*, 278 N.W.2d 639 (S.D.1979); *Isaak v. Isaak*, 278 N.W.2d 445 (S.D.1979); *Holforty v. Holforty*, 272 N.W.2d 810 (S.D.1978). This court will also "accept the evidence including any reasonable inferences which are favorable to the trial court's determination." *Isaak v. Isaak*, 278 N.W.2d at 446.

The first issue we deal with, raised by appellee in her cross–appeal, is the propriety of the decree on the grounds of her adulterous conduct. The record discloses that within a few months after entry of the

---

1. The decree dealt only with the three minor children.

decree appellee remarried. To reverse the trial court and remand with directions to vacate the decree would automatically make appellee a bigamist. We would hesitate to do so even if her contentions were correct. As this court stated in *Brockel v. Brockel*, 80 S.D. 547, 553, 128 N.W.2d 558, 561 (1964):

> The defendant could only have contracted a second marriage under authority of the divorce granted to the plaintiff. He does not come into court with clean hands when the relief he requests, if granted, would make him a bigamist. One in his position cannot accept the benefit of a judgment and then be heard to assert its nullity and invalidity.

We therefore hold that appellee is estopped from attacking the decree of divorce granted to appellant on the grounds of her adulterous conduct.

■ We next consider the award of custody of the three children, then ages thirteen, ten, and eight, to appellee. In awarding the custody of minor children the trial court has broad discretionary powers and this court will not interfere with that discretion unless there is a clear case of abuse presented by the record. *Spaulding v. Spaulding*, supra; *Isaak v. Isaak*, supra; *Holforty v. Holforty*, supra; *Kester v. Kester*, 257 N.W.2d 731 (S.D.1977).

■ In deciding the issue of child custody, the trial court must give primary consideration to the best interests of the children based on all the facts and circumstances. This decision is to be made relative to their temporal, mental, and moral welfare. *Isaak v. Isaak*, supra; *Miller v. Miller*, 245 N.W.2d 501 (S.D.1976); *Masek v. Masek*, 89 S.D. 62, 228 N.W.2d 334 (1975).

Appellant points out that during the period that appellee had in effect abandoned her family and moved to Minneapolis he, with the aid of a housekeeper, had afforded the children a good home environment, and that the arrangement would continue if he were awarded custody. The trial court met with the children individually in camera. While its findings of fact state that the children expressed a desire to live with their mother, the transcript of that session does not support that finding. We would view the children's responses as inconclusive, as one might expect from children of that age in that setting.

Appellant argues strenuously that appellee's marital misconduct is one of the reasons that she should not have received custody. Yet this court has held that marital misconduct does not necessarily make one an unfit parent so as to preclude that person from having custody of his children, when no evidence has been introduced to show that such conduct had a demonstrable effect upon the children. *Kester v. Kester*, supra; *Hershey v. Hershey*, 85 S.D. 85, 177 N.W.2d 267 (1970); *Wiesner v. Wiesner*, 80 S.D. 114, 119 N.W.2d 920 (1963).

■ In *Kester* this court went on to say that "we feel that one seeking to take custody from a mother has a burden of showing a harmful effect on the children caused by the mother's conduct." 257 N.W.2d at 734. There is nothing in the record to suggest that the children in this case were harmed in any way by appellee's marital misconduct, nor can we say that in reviewing the entire record the trial court erred in its decision to award custody to appellee. It is an exceedingly difficult issue in every contested case. The trial judge was in a far better position to assess the situation than we are in reviewing the cold record.

Subsequent to the entry of the decree and prior to oral argument the sixteen-year-old daughter (thirteen at the time of trial), by agreement, went to live with appellant. Upon remand we direct that the appropriate steps be taken to formalize the transfer of the custody of the sixteen-year-old and adjust the support payments accordingly.

With respect to the issue of property division, neither party is satisfied. Appellant argues that he has a negative net worth, or at best, a maximum of $20,000. He argues that he received property that was of less value than the encumbrances on it and additionally was saddled with $20,000 of unsecured debts accumulated by the par-

ties. He argues that he is simply incapable of supporting the financial burden imposed by the decree. Appellee on the other hand asserts that she was not awarded enough because appellant has a net worth of $80,-000 to $90,000, and a gross income of $50,-000 per annum.

As to the trial court's determination of valuation, granted there is some difference between the valuations placed on the property by the parties; however, the trial court is not bound to accept either as correct. The evidence was in conflict. Appellant had testified in deposition that the home should be worth $130,000, but he conditioned that on its being in a larger town than Lemmon. While the trial court's valuation was above appellant's trial valuation of $80,000, it was considerably below the $130,000 valuation claimed by appellee.

■ The only evidence regarding valuation of the property came from the parties themselves.[2] The principal difference was with respect to the value of the family home and the value of the law practice. We have said: "[W]e will not attempt to place a valuation on the assets because that task is within the province of the trier of fact." *Kittelson v. Kittelson*, 272 N.W.2d 86, 88 (S.D.1978). Where the parties come into the trial court without even a stipulation as to the values, then they had better be prepared to produce hard evidence as to those values other than their own personal opinions. Based upon the lack of such evidence in this record, we are not going to say that the trial court was in error in the valuations that it set. "Exactitude is not required of the trial court in the valuation of assets in a dissolution proceeding; it is only necessary that the value arrived at lies within a reasonable range of figures." *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn.1979).

As to the trial court's allocation of assets and debts, in *Kittelson*, supra, we said: "In reviewing the division of property . . .

we take cognizance of the fact that the trial court has broad discretion in making such division . . . and we will not modify or set them aside unless it clearly appears that the trial court abused its discretion." 272 N.W.2d at 88.

■ In dividing the property herein the trial court awarded appellee a 1976 automobile, $10,000 cash payable over three years, the personal property in her possession, and such household furnishings as were necessary to furnish a comfortable home for herself and the children. It also required that she assume an indebtedness of $5,000 which she had incurred in her quest to further her education after she had left the home. The trial court awarded appellant the family home, three lots in Lemmon, the law practice, a 1971 pickup, a 1977 automobile, the personal property in his possession, and the balance of the home furnishings after appellee had selected what she needed. The trial court also made appellant liable for all the debts accumulated by the parties except the $5,000 debt of appellee, which indebtedness apparently amounts to about $20,000 over and above the secured debts. In addition to the valuation problems, the division was further complicated by the nature and location of the assets that had been accumulated. The law practice was necessarily personal to appellant, and it does not seem appropriate to award heavily encumbered real property in Lemmon to appellee, who had apparently permanently departed from the town.

From our review it does not appear that the trial court was clearly erroneous in giving appellant the bulk of the property, because it also saddled him with the bulk of the debt. Thus, we dispose of appellee's contention. As for appellant's complaint regarding the property division, all appellee received was a 1976 Vega, some household furnishings, and $10,000 cash payable over a three–year period. Appellant referred to the $10,000 cash award as alimony; how-

---

**2.** The record indicates that there was some additional evidence in deposition testimony of a Mr. Rogers, a Lemmon banker. However, the record is unclear as to whether it was received and there is no such deposition included in the settled record, so we must assume it was rejected.

ever, as we view the record we agree with appellee that it was part of the property settlement.

■ "When dividing the money or property of the parties the trial court must make a fair and just award considering all of the material factors." *Wall v. Wall*, 260 N.W.2d 644, 646 (S.D.1977); *Kressly v. Kressly*, 77 S.D. 143, 87 N.W.2d 601 (1958). It appears to us that when the value of the assets is balanced against the indebtedness, coupled with the nature and location of the assets, the trial court did as well as humanly possible. We therefore affirm the trial court's property division.

With respect to the alimony provision, however, we do hold that the trial court abused its discretion. The award was for payment of $200 per month with no provision for cutoff. Considering the relative positions of the parties, we hold this award to be excessive. SDCL 25–4–41 provides that:

> Where a divorce is granted, the court may compel one party to make such suitable allowance to the other party for support during the life of that other party or for a shorter period, as the court may deem just, having regard to the circumstances of the parties represented; and the court may from time to time modify its orders in these respects.

■ As we said in *Guindon v. Guindon*, 256 N.W.2d 894, 898 (S.D.1977):

> The amount and length of alimony payments is therefore left to the discretion of the trial court. SDCL 25–4–41. The factors for consideration in exercising that discretion are similar to those used in the property division, i. e., (1) the length of the marriage; (2) their respective earning capacity; (3) their respective financial condition after the property division; (4) their respective age, health and physical condition; (5) their station in life or social standing; and (6) the relative fault of the parties in the termination of the marriage.

3. SDCL 25–4–45.1 reads as follows:
   Fault shall not be taken into account with regard to the awarding of property or the awarding of child custody, except as it may

We note that relative fault of the parties has generally been removed as consideration with respect to property division and child custody, but the statute [3] makes no reference to alimony or support after divorce. We therefore hold that fault continues to be a consideration in such awards.

In *Guindon* the trial court limited the alimony to a two–year period, at the end of which time the wife presumably would have completed her education so as to be able to go on to secure employment as a teacher. We held that under the circumstances there the trial court abused its discretion in terminating all alimony two years after the divorce decree because there was no credible evidence that she would be able to obtain employment.

■ The facts in the instant case are distinguishable from *Guindon*, inasmuch as appellee has been employed as a teacher over a considerable period of time, and she had nearly completed her master's degree to qualify her for a position as a counselor. The trial court found that upon obtaining her master's degree appellee would anticipate earning an income of $15,000 per year. This finding was supported by appellee's own testimony. This income is compared to the trial court's finding that appellant had a yearly net income of $20,000 a year. In setting an award equalling $2,400 per year, perhaps the trial court was attempting to strike a balance between the $15,000 and $20,000 figures. Were that the only question as to the propriety of the award we would probably hold that figure excessive under the *Guindon* criteria, especially (2), (3), and (5).

Our principal and strongest objection to the award is the failure of the trial court to provide for termination of the payments upon appellee's remarriage. Her adulterous relationship was the grounds for the divorce even though she testified at trial

be relevant to the acquisition of property during the marriage or to the fitness of either parent in awarding the custody of children.

that that particular relationship had ended and that she no longer loved or was involved with Seeley. The trial court should have anticipated that a woman of appellee's age and education would enter into another marriage. The fact that she married Seeley is of no import; that she did so within a few months, however, proves our point.

We hold, therefore, that under the circumstances of this case the trial court erred in its failure to limit the alimony provision until the remarriage of appellee,[4] and as we did in *Guindon* under the provisions of SDCL 15–30–2, we modify the alimony provision to provide for its continuation only until the remarriage of appellee, and we remand to the trial court for the purpose of determining the amount accrued within that limitation.

WOLLMAN, C. J., and DUNN and FOSHEIM, JJ., concur.

HENDERSON, J., concurring in part and dissenting in part.

HENDERSON, Justice (concurring in part, dissenting in part).

I shall refer to Curtis W. Hanks, plaintiff, appellant, and respondent on cross–appeal as the father; and I shall refer to Margaret Hanks, defendant, respondent, and appellant on cross–appeal as the mother.

The mother first denied, under oath, committing adultery. Later, under oath, faced with evidence, she admitted having an adulterous relationship with the superintendent of schools who was also married. After leaving the family home, she lived in five different residences; two of these were in Minneapolis, Minnesota, and three were in Vermillion, South Dakota. When the mother stayed with her brother in Minneapolis in the fall of 1977, her brother was living with a woman to whom he was not married. The mother exposed the children of this marriage to this illicit relationship when the children visited her in Minneapolis. When asked by the father if she had considered the children regarding her abandonment of the home and the children, she stated: "I am the only thing worth salvaging out of this whole god–damned mess." There was no denial by the mother that she made this statement. It further appears from the record that the mother had another meretricious relationship with a different man in Vermillion; called upon to deny the evidence, she claimed Fifth Amendment protection.

Perhaps I am a little bit old fashioned in this day and age, but I do not believe that adultery, lying under oath, exposing children to an illicit relationship of a close relative, leaving the father to care for three young children, living in five different residences in a short period of time, and demonstrating a calloused and indifferent attitude toward her children and a respectable married life, is conduct in the best interests of a child's temporal, mental, and moral welfare.

During the course of the trial, in an obvious ploy to influence the trial court, the mother told the court that she no longer loved the superintendent and that she no longer was continuing her relationship with him. In a hearing involving the custody of these children subsequent to the trial and divorce decree, it came to the attention of this court that she married the superintendent several months after the trial was completed. Again, this demonstrates that a mother of this ilk has such a total disregard for truthfulness, which is so pervasive of her character, that she cannot inculcate good values in her children. It is also to be noted that, while she played the part of the amorous nomad, the father abided in the family home (awarded to him), prepared the children's breakfasts and kept them clean and well dressed, disciplined the children, and took care of their special needs. Moral values must be instilled in children. The mother was gone and the father necessarily occupied a father–mother role. The father regularly took the children to church; the

---

4. We note that under IR Code § 71(a) and Regs. § 1.71–1, *limitation of otherwise periodic payments until remarriage of the wife does not* vitiate the payments as deductible alimony. 34 *Am.Jur.2d Federal Taxation* ¶ 7320 (1980).

mother, when she had custody in the summers of 1977 and 1978, rarely took them to church.

During trial, the mother sought to prove that the father was extremely cruel to her. She attempted to use this as a rationalization for leaving the family home. However, the trial court ruled that her counterclaim was without merit and it was dismissed. Absenting herself from the home was unjustified and was cruel to her husband and the children who needed her.

## THERESA

Theresa, age 14, was awarded to the mother. As a teen–age girl, she is impressionable and her best interests were not served by awarding her custody to a mother who lives by such extraordinary ideas of right conduct. Theresa has now departed the company of her mother, having elected to live with her father in the family home at Lemmon, South Dakota. Her custody is apparently not at issue.

## RACHAEL

Rachael, age 12, was awarded to the mother. This child suffers from a learning disability. As such, she needs special attention and parental help in the learning process. This learning disability was being treated in Lemmon and the father and educators there had plans to continue that treatment. Any child needs stability in the educational process. During the summer when Rachael was in the custody of the mother, Rachael's special education teacher assigned work to be done. There is no proof that this work was completed and the teacher testified that the assignments were never returned to her. Thus, Rachael suffered retrogression in her learning disability at the hands of her mother. Again, this young lady is impressionable and needs a stable environment and a parent who will attend to her special needs. The father followed through; the mother did not. It was error for the court to award Rachael to the neglectful mother.

## BRIAN

Brian, age 9, was awarded to the mother. Testimony of a clinical psychologist established that Brian needed a strong male figure with whom he could identify. Evidence further established that the father clearly provided a strong father figure and that he took all of the children hunting and fishing. The mother is a weak figure and preoccupied with her personal pursuits. The father is a well–respected attorney in Lemmon, South Dakota, where he was born, raised, and now practices law. Under the guiding hand of his father, Brian would have a stable, predictable life and testimony reveals that the mother was most unstable. The lower court did not, in any way, hold or even suggest that the father was unfit for custody. The mother demonstrated irresponsible conduct in leaving this boy. Encharging the father with the boy's custody reveals her belief that the father could ably raise the boy. It was an abuse of discretion to award Brian unto the mother.

The trial record establishes that the father provided a better moral example than the mother; he obviously provided a more stable home life. The trial court erroneously dismissed this evidence.

In my specially concurring opinion in *Spaulding v. Spaulding*, 278 N.W.2d 642 (S.D.1979), I expressed that the "father and mother must be compared as to who could provide the better educational, moral, physical, emotional, temporal, and mental benefits." Needless to say, when comparing these contending parents it is readily apparent that the father was the overwhelming jurisprudential choice in whom to repose custody of these three children. In *Spaulding*, supra, at 641 this Court stated:

> When the mother, by irresponsible conduct, indicates that her care and custody would be detrimental to the welfare of the child, custody may be awarded to the father. *Hines v. Hines*, 78 S.D. 464, 104 N.W.2d 375 (1960); *Blow v. Lottman*, 75 S.D. 127, 59 N.W.2d 825 (1953); *Sweeney v. Joneson*, 75 S.D. 213, 63 N.W.2d 249 (1954).

The trial court has broad discretion in awarding custody of minor children, and this Court will not interfere with that discretion unless the record presents a clear case of abuse. *Holforty v. Holforty*, 272 N.W.2d 810 (S.D.1978); *Pochop v. Pochop*, 89 S.D. 466, 233 N.W.2d 806 (1962). However, that discretion is a judicial discretion, not an uncontrolled one, and its exercise must have *sound and substantive basis in the testimony. Hines v. Hines*, supra; *Bunim v. Bunim*, 298 N.Y. 391, 393, 83 N.E.2d 848, 849 (1949).

In *Yager v. Yager*, 83 S.D. 315, 317, 159 N.W.2d 125, 127 (1968), this Court stated:

Neither parent is entitled to custody as a matter of right. The consideration paramount to all others is the welfare and best interests of the children [citing] *Larson v. Larson*, 70 S.D. 178, 16 N.W.2d 307 (1944); *Howells v. Howells*, 79 S.D. 480, 113 N.W.2d 533 (1962).

The mother would immerse and cloud our thinking with the liberal argument: "bad wife but not bad mother." The record discloses she was both. Good mothers do not forsake their children and leave the family home to take up a life of a person totally unaware of parental responsibility. It could be urged that the children were unaware of her adulterous life. However, this Court has also stated that the fact that children, because of their ages, do not understand the improprieties of their mother is not determinative. *Yager*, supra, at 317, 159 N.W.2d at 128; *see also Currin v. Currin*, 125 Cal.App.2d 644, 271 P.2d 61 (1954) and *Bunim*, supra.

It is to be remembered that the mother taught in the Lemmon School system from January 1969 until the end of the 1977 school year. For nearly two years, the evidence shows that the mother carried on an adulterous affair with her superintendent. Her meretricious conduct included rendezvouses with the superintendent at Minneapolis, Minnesota; Sioux Falls, South Dakota; and Flagstaff, Arizona. This conduct finally burst upon the public scene in this small western South Dakota town into public affection. To my way of thinking, this was detrimental to these young girls and this little boy. The children attended the Lemmon School system where the superintendent presided and the mother was a teacher. When confronted by her husband, the mother lied about her relationship with the superintendent. Similar acts of adultery have been found by the courts to constitute evidence of aggravated maternal unfitness and custody was awarded to the father. *McNamara v. McNamara*, 181 N.W.2d 206 (Iowa 1970); *Peck v. Peck*, 16 Ill.2d 268, 157 N.E.2d 249 (1959); *Baker v. Baker*, 166 Neb. 306, 89 N.W.2d 35 (1958).

Applying the settled law of this state to the facts of this case, I therefore dissent and would reverse the trial court and return (vest custody in) the two children to their father for these reasons: (1) there was no sound and substantial basis in the testimony to grant their custody to the mother, (2) the mother's irresponsible conduct has indicated that her care and custody would be detrimental to the children, and (3) the welfare and best interests of the children would be best served by placing them with the father. I concur in the balance of the majority opinion.