**Ammon LANPHEAR, Plaintiff and Appellant,**

v.

**Muriel Joyce LANPHEAR, Defendant and Appellee.**

**No. 12819.**

Supreme Court of South Dakota.

Submitted on Briefs April 22, 1980.

Decided March 11, 1981.

---

* The trial court rounded off this latter figure to $18,900.00.

Reed C. Richards of Richards & Richards, Deadwood, for plaintiff and appellant.

Ralph C. Hoggatt, Deadwood, for defendant and appellee.

WOLLMAN, Chief Justice.

The issue on this appeal from a judgment and decree of divorce is whether the trial court abused its discretion by awarding defendant, Muriel Joyce Lanphear, $1,000 as her share of a coin collection, $1,000 moving expenses and $200 per month alimony. We affirm.

Plaintiff Ammon Lanphear was fifty-eight years old at the time of trial, October 1978; defendant was sixty years old. They were married in 1975 at the request of plaintiff's dying first wife. Each party maintained separate checking and savings accounts. Their separate property remained separate. They accumulated no joint property.

Defendant quit her $350-a-month job as a priest's housekeeper to move to South Dakota and marry plaintiff. A year after the marriage defendant reinjured her back when plaintiff slammed a door in her face. This injury precluded her from working during the marriage and precluded her from returning to her previous employment. She has spots on her lungs that may be cancerous. She is certified as totally disabled for social security purposes and receives $180 per month in disability payments.

Plaintiff is in good health. He works as a motorman for the Homestake Gold Mine, earning between $10,000 and $11,000 per year.

The trial court awarded defendant $200 per month alimony for as long as she lives, remains unmarried, or until further order of the court. Plaintiff argues that the alimony award is an abuse of the trial court's discretion.

After considering the relative positions of these parties, we conclude that the amount of alimony awarded is not excessive. Defendant was sixty years old at the time of trial. Her physical disability precludes her from returning to the housekeeping work that she performed for twenty years. Her sole income is the $180 per month disability payment. Plaintiff is younger and healthier. He owns real estate. He has a steady job and takes home $850 per month. The $200 per month alimony award was not an abuse of discretion, given the situation of each party relative to the factors pertinent to an award of alimony. Defendant was entitled to an amount of alimony which would allow her to maintain a reasonable standard of living. *Hansen v. Hansen*, 273 N.W.2d 749 (S.D.1979).

The trial court also awarded defendant $1,000 as her share of a coin collection and $1,000 moving expenses. Plaintiff argues that this award was an abuse of the trial court's discretion. The record indicates, however, that plaintiff complied with the judgment by paying defendant $2,000. The voluntary payment of this award under the judgment precludes our review of that portion of the judgment. *Kerr v. Kerr*, 74 S.D. 454, 54 N.W.2d 357 (1952).

The judgment is affirmed.

DUNN, MORGAN and FOSHEIM, JJ., concur.

HENDERSON, J., concurs in part and dissents in part.

HENDERSON, Justice (concurring in part, dissenting in part).

I agree that appellant has placed himself in a posture which precludes appellate review of the coin collection and moving expense portions of the judgment by paying same. However, I cannot join my colleagues in affirming the award of $200 per month alimony. Although I have the greatest respect for the hardworking, conscientious trial judges of this state, I owe a responsibility of in-depth review as I pointed out in my dissent in *Herrboldt v. Herrboldt*, 303 N.W.2d 571 (S.D.1981). Basically, I would reverse the alimony award because (1) I seriously question that appellant has the ability to pay the $200 per month award, (2) the award was based upon what the trial court thought appellee needed and not what appellant ought to pay, and (3) the settled law of this state, as found in *Hanks v. Hanks*, 296 N.W.2d 523 (S.D.1980), and *Guindon v. Guindon*, 256 N.W.2d 894 (S.D.1977), may be applied to the facts of this case, as set forth below, and the equities of the case simply reflect that the alimony award was excessive. Necessarily, my conclusion is that there was an abuse of discretion.

This case was tried in one day at the circuit court level. At its conclusion, with testimony fresh in his mind, the trial judge observed: "It would appear that this was a marriage that probably never should have been in the first place, but it was." Appellant married his deceased wife's sister, a divorcee of twenty years. This arose through the deathbed supplication of appellant's wife: "I'd like to have you marry her, if possible, because she needs somebody to take care of her in her older age; I don't want you to stay single and mourn over my death." The marriage was founded upon a sense of obligation, for it was upon these words being stated that appellant expressed to his dying wife that he "had not given it much thought, that we really didn't know each other, but if things were right, why it could be arranged." The record is devoid of any courtship or premarital affection. The circuit court found: "This marriage in its inception was, to say the least, unusual."

Appellant's first wife passed on from this life in June, 1974. His first marriage was a good one, brought forth children, and was happy. Under the above deathbed arrangement, appellee and appellant were married in May, 1975. Appellee had made her home in Montana for many years earning a living as a housekeeper for priests. It is noted that appellee was at the hospital the day before her sister died and her testimony was: "Yes, she'd (the dying sister) asked me, too." This second marriage for appellant created a matrimonial patch of nettles rather than a bed of roses. That both of the litigants were unhappy in this marriage, there can be no doubt. However, appellee's motivation for the marriage was economic. She apparently made no promise to her dying sister. Indeed, her own testimony reveals that she had been diagnosed as having had cancer and her back had been broken some ten to twelve years before this marriage and she knew that appellant had medical benefits furnished by his employer, Homestake Mining Company. She testified that she was financially fit and "I was wanting someone else to take over from there. Yes, I knew he was making money."

The trial court granted a divorce to appellant, finding that there was sufficient grounds for divorce, appellant having pleaded extreme cruelty by the infliction of grevious mental suffering upon him. There can be no doubt that the trial court found appellee to be the party at fault (fault is a factor to be considered in granting alimony, see *Hanks* and *Guindon*, supra). From the inception of this marriage, appellee began making derogatory remarks about her deceased sister; this, of course, caused appellant great mental anguish for he had dearly loved his departed wife. Appellee, in the opening days of the marriage, began to disparage appellant's children and berate his departed wife and mother of these children on how badly she had raised the children. Appellee also belittled her departed sister's housekeeping. For a man who had taken her into his home as his wife to care for her and be good to her, these were indeed cruel and inhumane remarks calcu-

lated to injure, wound, and sow unhappiness into the home. Appellee, following her course of conduct as a petulant fault finder, nag, and critic, criticized the children's conduct towards appellant and appellant's general upbringing of the children. This language was calculated to drive a wedge between appellant and his children. From this crop of unhappiness, she desires to harvest alimony. Appellant ought not have to pay.

Attempting to put some recreation and verve into their life, appellant enrolled the litigants in square dance lessons. They were instructed to change partners. Appellee visualized this as his yearning for other women. Appellant testified that she expressed to him that if he "went out and got all worked up with these square dancers, why didn't I have them take care of me instead of coming home to her." Problems also developed during the marriage concerning the handling of money. Appellee threw the checkbook at appellant. Appellee failed and refused to join her checking and savings accounts with that of appellant's. Appellant, continuing to try to make the marriage work, sought out counseling; appellee, after two conferences with a professional counselor at Spearfish, refused to go back saying the counselor was a drunk. The couple appeared to be in financial straits and this is well established by the record. Quarrels ensued. Appellant sought the help of his minister and a budget was worked out. Appellee refused to implement the budget and placing her hands in the air exclaimed: "No way will I take the responsibility." My point is: appellant tried his very best to make this marriage work and appellee insisted on being miserable. She should not profit from her shrew-like, termagant conduct.

The trial court's Finding of Fact IV recites:

> The Plaintiff [appellant] was in reasonably good health for his age and had an earning capacity of between $10,000 and $11,000 per year. The defendant [appellee] had a history of medical problems antecedent to the marriage including a broken back and cancer. During the marriage the back was reinjured and either as a result of the injury or the progression of the prior injury or combination of both, she was certified as totally disabled for Social Security purposes and draws a disability check. [Author's note: appellee admitted to pre-marriage arthritis in the back which caused her pain.] It appears that the most recent injury was in May of 1976 and defendant [appellee] continued to bowl thereafter on a more or less regular basis, drive her car, and perform normal household functions.

If appellee can carry on normal household functions, which can be denominated as housekeeping functions, then she is not precluded from being a housekeeper or domestic servant for any employer. The Social Security Administration declaration is not binding upon this Court. It strikes me that, if she can bowl and drive a car and work around a home, she is not helpless and is not disabled from work. Thus, the trial court concluded as a matter of law that she needed alimony when the findings of fact do not bear out this conclusion.

At the time of the trial, appellant was 58 and appellee 60 years of age. When the parties were married, appellant was a contract miner in the depths of the Homestake Gold Mine. There are many ways to serve the Lord, but the hardrock miners grubbing out gold at the mile deep level is one of the most arduous and dangerous of all. Appellee found fault with appellant's employment and for a unique reason. Basically, appellee wanted him to quit his job as a contract miner so that he could perform his "sex life right." Although she denies it, the record is replete with quarrels over sex, the frequency of it, and the reasons for having it. "You can't take care of the sex life right and contract because you don't have enough strength left to take care of it and I wish you would quit contracting to take care of this item," were the words of appellee according to appellant's frank testimony. As reflected by the income tax records received into evidence, appellant's salary was diminished from approximately $16,500 per year to approximately $10,500 per year.

In a nugget, his income-producing capacity at Homestake was reduced at her insistence.

Other factors to be considered in alimony awards: duration of the marriage (the marriage lasted 37 months); value of the property (the circuit court found that "some improvements were made during the course of the marriage but there is no showing that any of the Defendant's [appellee's] money was thus utilized"); contribution of each party to the accumulation of property (the circuit court found that "the major asset owned by the Plaintiff [appellant] appears to be the real estate upon which his home sets") and "the only other major asset appears to be a fifth-wheel camper and it too was purchased prior to this marriage"; defendant's (appellee's) separate income of around $7,000 was never put into a joint account and was not utilized in any manner for the accumulation of property during the marriage. Appellee placed this $7,000 in her separate checking and savings accounts in Montana. This $7,000 arose from unemployment insurance benefits, hospitalization benefits, and disability payments. During the marriage, appellant provided appellee with the necessities of life, paid for the insurance on appellee's automobile, and paid her monthly health insurance payments.

The trial judge, with compassion, anguished over the testimony that appellee might have cancer of the lungs due to spots detected thereon. His decision was cautiously held in abeyance until he could make a determination of this condition from medical reports. Two months subsequent to the divorce trial, a medical report was submitted indicating that appellee had repeat tomograms at the Denver Presbyterian Hospital. No change was indicated when these were compared with the x-rays from the Rapid City unit dated August 17, 1978.

The doctor expressed that "this does not prove that the nodules are benign, but it does make me a little more comfortable while observing these nodules at three-month intervals." I make this point: there is no finding in this record that appellee suffers from cancer now; there is evidence in the record that she suffered from cancer several years before this marriage. I would not place my judicial hand on this appellee with implacable or unmerciful judgment. Anyone who has suffered with the diagnosis of cancer during a lifetime has suffered greatly and deserves understanding and benevolence. Nor would I be unresponsive to appellant's entreaty and deprive him of impartiality during his appellate hour. Sympathy should not be permitted to creep into the adjudication of alimony. Alimony is not founded on sympathy. In South Dakota, it is founded on the factors set forth in *Hanks* and *Guindon*, supra. The $200 per month alimony award will exact from appellant approximately one-fourth of his net income. He will have $650 per month to live upon and is faced with the greatest inflation in history. He grows old. The trial judge, in his findings, noted that the $200 monthly payment would work a hardship on appellant. If this be true, a court of equity is wrong in inflicting a hardship. Courts of equity were not created to create hardship; they were created to relieve hardship. Appellee's financial woes are not the responsibility of appellant. Considering appellee's twenty-year life expectancy, Am. Jur.2d Desk Book, Item No. 159 (1979), the alimony award amounts to $48,000.