**Donald H. KELLEY, Plaintiff and Appellee,**

v.

**Penelope M. KIRK, Formerly Penelope M. Kelley, Defendant and Appellant.**

No. 14881.

Supreme Court of South Dakota.

Argued Oct. 21, 1985.

Decided July 9, 1986.

J. Crisman Palmer of Gunderson & Palmer, Rapid City, for plaintiff and appellee.

Ronald Clabaugh of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

MORGAN, Justice.

This appeal arises from a decree of divorce terminating the marriage between Donald H. Kelley (Donald) and Penelope M. Kelley (Penelope). Penelope appeals from that portion of the decree awarding alimony and also appeals a portion of the property division. We affirm in part and reverse in part.

Donald and Penelope were married on June 23, 1963. At the time of the marriage, Donald had completed his freshman year in medical school and Penelope had received her Bachelor's Degree in education. During the course of Donald's medical education and residency program, Penelope was employed as a teacher and earned the bulk of the family's income. In 1972, Donald and Penelope moved to Rapid City, South Dakota, where Donald became employed in a professional partnership practicing pathology. In 1982, the couple separated and on December 28, 1984, each was granted a divorce from the other.

We examine Penelope's contention that the trial court erred in its award of alimony. We first examine the award made by the trial court, which we find to be rather unique. The trial court's calculations were set out succinctly in the following findings of fact:

32.

That from 1963 through 1970 the difference between the earnings of Plaintiff and Defendant was approximately $12,000, $6,000 of which the Defendant would have used to support herself and $6,000 of Defendant's earnings were used to support Plaintiff, resulting in $6,093.50 reimbursement alimony to Defendant.

33.

That because Defendant quit working in her profession, she has suffered a depreciation in human capital, according to her evidence, of $50,218 when considering the wages she would earn upon reentry into the job market now as opposed to what she would have earned had she continued in the teaching profession and then offsetting that by her present net worth. That said sum of $50,218 is awarded to Defendant as restitutional alimony.

34.

That had Defendant continued working in the teaching profession her salary today would be approximately $24,000 per annum. That she is entitled to rehabilitative alimony of $24,000 for three years or a total sum of $72,000 as rehabilitation alimony.

35.

That the total alimony award from Plaintiff to Defendant is the sum of $128,311.50. That when considering the reasonable present living needs of Defendant, her present depressed earning ability and the interest she can earn on her accumulated liquid net worth a payment term of ten years at $12,831.15 per year or $1,070 per month should enable her to reasonably support herself without expending accumulated net worth.

Penelope complains that the award is woefully inadequate on several grounds. Citing the factors found in *Guindon v. Guindon*, 256 N.W.2d 894, 898 (S.D.1977), for consideration in setting alimony, she argues that the trial court based its award solely upon Donald's projected earnings of $18,000 per annum rather than his demonstrated earning capacity of $145,000 per annum, citing us to part of the trial court's Finding of Fact 18: "That his earning capacity for the immediate future will be

approximately $18,000 per year plus travel expenses."

If this were the entire picture, we would undoubtedly be inclined to agree with Penelope.

The record reflects that at the time of trial Donald testified that it was his intention to forsake the pathology practice that he had previously been engaged in and that he intended to enter a field of medicine more directly involved with primary patient care in a third world underdeveloped country. The trial court very carefully considered this situation, noting in Finding of Fact 15:

That in listening intently to Plaintiff's testimony and observing his demeanor, the Court finds that Plaintiff is sincere and truthful in his desire to change his professional lifestyle and his approach to medicine.

The trial court also found in Finding of Fact 16:

That Plaintiff's earnings have been inflated to some degree because of his work ethic. That he has been engaged in a stressful profession and has become burned out and somewhat disillusioned by his profession and his practice. That his decision to change his professional lifestyle, although voluntary, is a reasonable one to infer from the circumstances and justified for his own continuing mental and physical health and well-being. That because of this decision not to professionally pursue monetary gain but to pursue a 'hands-on' approach to medicine amongst the poor and less privileged people of the world there will be a drastic change in his earnings from his profession.

Finally, we note the pertinent portion of Finding of Fact 18:

That the decision on the part of Plaintiff to change his professional lifestyle was not made by him for purposes of affecting the outcome of this case or to intentionally reduce Defendant's future spousal support. That a ten year period for monthly installments in alimony will sufficiently protect Defendant in the

event Plaintiff should change his mind in a few years. That Plaintiff is entitled to lead his own life and practice his profession for the balance of his life as he sees fit subject to his reasonable obligations to Defendant. That although the Plaintiff will continue to work as a physician and practice medicine it will be for a drastically reduced annual income.

■ Furthermore, contrary to Penelope's suggestion, the trial court considered all of the *Guindon* factors as more fully set out in the following findings of fact:

30.

That when considering alimony, the amount thereof and the duration the Court finds as follows: That the parties have been married twenty-one years; they are both intelligent productive individuals, the Plaintiff's fault was somewhat more than Defendant's; they both have a good education; the Defendant is entitled to maintain a reasonable lifestyle; the Plaintiff's earning ability is greater than the Defendant's; the Defendant is not entitled to sit back in idleness for the rest of her life at the expense and servitude of the Plaintiff; that after the foregoing property settlement the Defendant's financial position will be such that she will be able to maintain a reasonably good lifestyle by prudent management of her assets and less entertaining.

31.

That in reaching the alimony determination the Court considered the past earning ability, present earning ability and future plans and potential earning capacity of the parties and each parties [sic] contribution to the present equity position of the parties.

■ Penelope further complains that the trial court, by failing to apply a legal rate of interest to the monthly payments, in effect reduced the $128,000 award to the neighborhood of $75,000 present value. Penelope cites no authority for this proposi-

tion. We therefore deem the argument waived. *Corbly v. Matheson*, 335 N.W.2d 347 (S.D.1983).

Penelope also complains that while the trial court found that over half of the alimony was rehabilitative and based on a three-year period, it spread the payments over a ten-year period; thus it could not be categorized as rehabilitative alimony. She also complains that the award was inadequate based on the facts of the case: That the trial court failed to take into consideration the tax consequences on the alimony payments as deductible by Donald and chargeable to her; that the trial court excluded consideration of Donald paying sufficient alimony to cover mortgage payments, taxes and insurance on the residence; and car payments for a future car and wardrobe and entertainment expenses. In this regard, and in finding of fact 39, the trial court noted that Penelope's anticipated monthly living needs of $3,697 is unreasonably excessive. The trial court found further that Donald should not be responsible for satisfying the mortgage on the residential home, approximately a $26,000 mortgage on a $150,000 home awarded to Penelope, when the distribution was made on the basis of that equity. The trial court further found that Donald should not be responsible for making automobile payments for the duration of the support period when Penelope was awarded two automobiles.

Finally, the trial court noted that Donald should not be responsible for allowing her to frequently entertain her friends during this spousal support period and that if Penelope desires to spend thousands of dollars per year on her wardrobe it should be done out of her accumulated net worth not his future servitude. The trial court then found that she reasonably needs the sum of $2,063 per month, that her present earning ability, interest on her net worth, and the sum of $1,070 in spousal support will provide for her needs.

Reviewing the findings of fact and conclusions of law as a whole, it is apparent that this is a very well thought out plan on the part of the trial court in an attempt to equitably divide the property of the parties and to provide adequate support for Penelope until she is completely on her own.

■ We conclude that the alimony award is adequate considering the parties' relative young age, their relatively good health, and the ability of both to pursue a career. More importantly, Penelope will receive approximately $240,000 under the property settlement. We cannot say after reviewing all the relevant factors that the trial court abused its discretion in making the alimony award.

We now consider Penelope's contention that the trial court erred in considering certain income tax consequences of liquidation of Donald's pension and profit-sharing plan and his interest in his professional practice when valuing the assets of the parties for distribution. The trial court valued and divided the marital estate as follows:

| Property | Value | Distribution | |
|---|---|---|---|
| | | Plaintiff | Defendant |
| 1. Family residence | $124,500.00 | | $124,500.00 |
| 2. Pension and profit sharing plan of Donald | *145,613.65 | $145,613.65 | |
| 3. Donald's interest in professional practice | *100,793.00 | 100,793.00 | |
| 4. Piano | 5,500.00 | 5,500.00 | |
| 5. Investments | 20,000.00 | | 20,000.00 |
| 6. Household goods | 7,500.00 | | 7,500.00 |
| 7. Art, oriental rugs, etc. | 21,800.00 | | 21,800.00 |
| 8. 1980 Subaru auto | 4,500.00 | | 4,500.00 |
| 9. 1979 Datsun auto | 7,500.00 | 7,500.00 | |
| 10. 1976 Mercedes auto | 22,500.00 | | 22,500.00 |
| 11. Cash value of Conn. | | | |

| Property | Value | Distribution | |
| --- | --- | --- | --- |
| | | Plaintiff | Defendant |
| Mutual Life Ins. $2,687,404 | 8,504.00 | 8,504.00 | |
| 12. Cash value of Conn. | | | |
| Mutual Life Ins. $3,838,108 | 1,108.00 | 1,108.00 | |
| 13. Stock–Minn. Power & Light | 2,775.00 | | 2,775.00 |
| 14. Stock–IDS Mutual Fund | 2,000.00 | | 2,000.00 |
| TOTALS | $474,593.65 | $269,018.65 | $205,575.00 |
| Shortfall | 63,443.65 ÷ 2 | −31,721.82 | +31,721.83 |
| NET | | $237,296.83 | $237,296.83 |

Items 2 and 3 above are after-tax values. Penelope claims that in considering the tax consequences of the liquidation of the assets which came to approximately $50,790, the trial court erred and that she is entitled to approximately one-half of this value. We agree.

This court has previously stated that our standard of review with regard to valuation of the property is whether the trial court divided the assets in an equitable manner. Under this standard, we have previously considered income-producing property, *Stenberg v. Stenberg*, 90 S.D. 229, 240 N.W.2d 100 (1976); assets overlooked or minimized by mortgages which may or may not be legitimate liens against the marital property, *Kittelson v. Kittelson*, 272 N.W.2d 86 (S.D.1978); a necessity for inclusion of the present value of retirement accounts, *Hansen v. Hansen*, 273 N.W.2d 749 (S.D.1979); omitted assets, *Guindon, supra*. We have further stated that the trial court is not bound by valuations testified to by the parties; but, where valuations are not agreed upon, the parties should be prepared to proceed with hard evidence and the court need only find a value within a reasonable range. *Hanks v. Hanks*, 296 N.W.2d 523 (S.D.1980). Throughout all these cases, we have repeatedly stated that this court does not sit as a trier of fact and thus we will not attempt to place a valuation on any of the assets involved in the property settlement. *See Hanks, supra; Hansen, supra; Kittelson, supra; Guindon, supra; Stenberg, supra*. As we pointed out in *Herrboldt v. Herrboldt*, 303 N.W.2d 571, 572 (S.D.1981), "[t]he only time that this court will interfere with the valuations as determined by the trial court is when the trial court has made a clearly erroneous valuation finding[.]" (Citation omitted.)

The issue before us in this case is whether the trial court erred in using after-tax value of certain assets rather than before-tax values, a difference of $50,790. This is purely a question of valuation, not division. The trial court could very well have left the tax consequences out of the computations and divided the total sum sixty/forty or fifty-five/forty-five and we would then probably be arguing the equity of the division. We have repeatedly said that trial courts are not bound by any mathematical formula and this court will not set aside or modify a decision unless it clearly appears that the trial court abused its discretion. *Hansen, supra; Kittelson, supra*. In this instance, the trial court attempted to make a fifty/fifty division down to the odd dollars and cents. Donald did not challenge this formula by notice of review, so for all intents and purposes in this case it is locked in. We then look solely to the question of the propriety of the valuations.

Previously, on two occasions, we have looked at the propriety of impacting valuations with alleged tax consequences. In *Lien v. Lien*, 278 N.W.2d 436 (S.D.1979), where the trial court had allotted the wife a one-third share in the marital assets, husband nevertheless attacked the division arguing that the trial court failed to fully

consider the federal income tax consequences and that it should have deducted the federal income tax liability which would accrue if husband liquidated all his assets. We agreed that the trial court must reduce a party's net assets by the deferred federal income tax accruable on a total liquidation of assets if (a) the property division compelled a total liquidation of assets, and (b) if it were probable that the most disadvantageous method of sale from a tax standpoint would be used. In *Lien,* however, we held that neither of these assumptions was supported by the record.

Again, in *Wallahan v. Wallahan,* 284 N.W.2d 21 (S.D.1979), husband complained that the trial court erred in making the property division and alimony award without recognizing the resulting federal tax ramifications. More specifically, he claimed that the court did not give full consideration to the imposition of capital gains tax which would arise from the court's order that the wife be awarded the parties' residence. The wife disputed that. We noted the trial court was following the rule laid down in *Lien, supra,* that theoretical tax consequences on transactions which are not necessary or probable but merely conjectural need not be considered. We held: "On the basis of the conflicting claims and in the absence of any concrete evidence of the tax consequences of this transfer, we find no error in the trial court's refusal to speculate on the possible tax, particularly in view of the court's consideration of the tax problems as indicated[.]" 284 N.W.2d at 25.

In the case before us, there is no question but what Donald has incurred tax consequences which the trial court impacted on the valuations. The question, however, is whether the decree of the court required the liquidation of the assets, which incurred the tax consequence. For the purpose of this discussion, we refer back to the trial court's findings 15, 16, and 18, previously set out under the first issue. We further note, in pertinent part, the trial court's Finding of Fact 20.

Plaintiff has resigned effective year end 1984. After his resignation it is not reasonable to expect him to leave the investments in place or his former colleagues to allow it. It is unlikely that leaving such an investment in place would be practical especially considering his plans to leave the country. Also, in order to provide Defendant with the shortfall property distribution she is entitled to it is necessary for the funds to be liquidated.

It is this last sentence that Donald relies on to argue that we should affirm the trial court's valuation. We do not question Donald's sincerity nor his determination that he needs to change his professional lifestyle and practice; nor do we suggest that the decision was made for the purpose of decreasing the valuation of his assets to affect the outcome of this case. The record fully supports that the decision to resign his present practice, which occasioned the required liquidation, was made in advance of the trial itself. Indeed, in Finding of Fact 20, the trial court further noted: "The tax ramifications are not speculative they are realistic and certain and represent a diminution in asset valuation *which would occur even if the parties weren't getting a divorce.*" (Emphasis added.) We find no support in the record for the trial court's assertion that the liquidation was necessary to provide funds for the property distribution.

We, therefore, conclude that the trial court's decision as to the valuation of the property be reversed and that Donald be required to pay the additional sum of $25,-395 to Penelope in order to remain consistent with the trial court's decision to divide the property equally.

FOSHEIM, C.J., and WUEST, J., concur.

HERTZ, Acting J., concurs specially.

HENDERSON, J., concurs in part and dissents in part.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HERTZ, Acting Justice (concurring specially).

I fully concur, but write specially on the income tax issue.

At the trial, the parties stipulated that the pension and profit sharing plan had a value of One Hundred Eighty Thousand Two Hundred Four Dollars ($180,204), and that his shares in his professional association had a value of One Hundred Sixteen Thousand Nine Hundred Ninety-Two Dollars ($116,992). Dr. Kelley's C.P.A. testified that there would be income tax payable in the amount of Thirty-Four Thousand Five Hundred Ninety Dollars ($34,-590) on the pension and profit sharing plan, and thereby reducing its total value to One Hundred Forty-Five Thousand Six Hundred Thirteen Dollars ($145,613). The C.P.A. also projected the income taxes on the sale of the shares in the association at Sixteen Thousand One Hundred Ninety-Nine Dollars ($16,199), thereby reducing the total value of the shares to One Hundred Thousand Seven Hundred Ninety-Three Dollars ($100,793). Accepting these figures, the trial court reduced the marital estate by a total sum of Fifty Thousand Seven Hundred Fifty-Nine Dollars ($50,759).

The court entered Findings as follows in justification of the reduction of the aforementioned sum from the total net marital estate: "Plaintiff has resigned effective year end 1984. After his resignation it is not reasonable to expect him to leave the investments in place or his former colleagues to allow it. It is unlikely that leaving such an investment in place would be practical, especially considering his plans to leave the country."

The trial court also made the additional finding: "Also, in order to provide defendant with the shortfall property division she is entitled to, it is necessary for the funds to be liquidated."

Dr. Kelley testified that he had resigned effective December 31, 1984, which is prior to the trial, and that he absolutely was not returning to the practice of pathology. The trial court believed this testimony and accepted it as a good faith action on the part of Dr. Kelley. I have no quarrel with this finding by the trial court. However, the court then went on to find that it was necessary for Dr. Kelley to liquidate those funds to pay the shortfall in the property distribution to Mrs. Kelley. I find no support in the record for this finding by the trial court.

The division by the court included the payment of the sum of Thirty-One Thousand Seven Hundred Twenty-One Dollars Eighty-Three Cents ($31,721.83) to Mrs. Kelley. If the income tax consequences had not been deducted from the net marital estate prior to the distribution of the remaining property, Mrs. Kelley would have been entitled to an additional payment of some Twenty-Five Thousand Three Hundred Seventy-Nine Dollars Fifty Cents ($25,379.50). The evidence establishes that Dr. Kelley could have made this payment without liquidating his pension and profit sharing plan. At the time of trial Dr. Kelley had Sixty-One Thousand Two Hundred Forty-Six Dollars Twenty-Three Cents ($61,246.23) in savings accounts, money market accounts, and IRA accounts. (*See:* Defendant's Exhibit "J"). In addition, the court also had the option to have any shortfall paid over a period of time.

Dr. Kelley's voluntary decision to seek employment and a different lifestyle that would compensate him at a rate of only seven percent of his normal earning capacity not only affected the trial court's decision on alimony, but imposed an income tax burden unfairly on Mrs. Kelley. The trial judge's laudable attempt to divide the property on a fifty-fifty basis was thereby thwarted by the unilateral action of Dr. Kelley.

Even if the $61,246.23 was somehow not available to Dr. Kelley for the cash payment to Mrs. Kelley, I would still hold Dr. Kelley solely responsible for the income taxes resulting from his decision to change his lifestyle.

Dr. Kelley relies on our decision in *Lien v. Lien*, 278 N.W.2d 436 (S.D.1979), where we held that a trial court may reduce the

valuation of assets by the amount of tax consequences if the property division compels a total liquidation of assets. While I agree fully with the principle of law stated, it, nevertheless, has no application to the facts of this case.

Dr. Kelley concludes that it was the decree of the trial court which required the liquidation of his medical practice. All the decree did was to declare a cash payment due to Mrs. Kelley in order to keep faith with the fifty-fifty division of the property. Nowhere in the decree does it require Dr. Kelley to totally abandon his lucrative medical practice for a lifestyle that would drastically reduce his income. The decision to change his lifestyle, which would require him to sell his practice, was Dr. Kelley's, and his alone. This is what clearly distinguishes this case from the *Lien* case. The *Lien* case stands for the proposition that *where the decree of the court compels a liquidation of assets,* then, and only then, can the trial court reduce the valuation of the assets by the amount of the tax consequences. (Emphasis mine.) The trial court misapplied the procedural application of this rule when it accepted Dr. Kelley's "good faith" change in his lifestyle. In so doing, the trial court allowed Dr. Kelley to control the ultimate result of the property division. Instead of the decree of the court compelling the liquidation of his practice, it was Dr. Kelley's voluntary and unilateral actions that required it.

It is certain that the deduction from the net marital property was the result of Dr. Kelley's decision to leave the practice of pathology. The effect of the court's decision was to require Mrs. Kelley to share half of the income tax burden created by Dr. Kelley as a result of his unilateral decision to terminate his practice and develop a different lifestyle.

The real issue is whether Dr. Kelley, financially situated as he was, was required to liquidate this property in order to comply with the distribution ordered by the court. I believe that the answer to this question is clearly no.

It is one thing to accept Dr. Kelley's good faith change in his occupation and lifestyle, it is quite another when the court penalizes Mrs. Kelley for something neither she nor the court were responsible for.

To accept Dr. Kelley's contention on this phase of the property distribution would prompt others similarly situated to claim a tax credit resulting from their own unilateral action not in anyway required by the distribution decreed by the trial court. Furthermore, what would prevent Dr. Kelley from returning to his medical practice after this appeal is finalized? Another "good faith" change in lifestyle is certainly not beyond the realm of possibility. He then would have used the system in a manner that good conscience and equity denounce in the strongest terms. This is just another reason why Dr. Kelley should not be entitled to a Twenty-Five Thousand Three Hundred Seventy-Nine Dollar Fifty Cent ($25,379.50) income tax contribution from Mrs. Kelley.

That Dr. Kelley can remove himself from his present employment and change his lifestyle is not the issue. I believe, however, that when a party voluntarily causes the tax consequences, he ought to bear full responsibility therefor and should not be permitted to pass half of his tax burden onto the other party, when neither that party nor the action by the court requires it. The totality of the distribution is not what carries the day, it is simple adherence to the concept of fundamental fairness that mandates such a result. The concept of equitable distribution, which is required by the statute and our cases, would be seriously eroded if we were to accede to Dr. Kelley's claim.

This simply is not a case where the divorce decree causes immediate tax consequences. Dr. Kelley has not shown that he had to sell his property in order to satisfy the monetary award to Mrs. Kelley. To the contrary, all he has shown is that because of his change in his lifestyle it was necessary to sell this property. It is patently obvious that the trial court considered Dr. Kelley's change of lifestyle as

controlling in making the deduction for income taxes that the court did. The tax consequences here were in Dr. Kelley's complete control; that being so, it is entirely appropriate to allocate to him all of the potential tax liability.

In short, regardless of the certainty of the tax liability, in the absence of proof that the taxable event has occurred either during the marriage or will occur in connection with the division of the property, I would hold that it would be error and an abuse of discretion for the trial court to deduct such taxes from the total marital estate prior to division.

HENDERSON, Justice (concurring in part, dissenting in part).

This Court apparently holds that the trial court made a good decision on the division of property and the alimony award. However, the Court wants to isolate one portion, the tax consequence aspect, out of the trial court's decision and call it error. I disagree. Cleverly, the majority does this by stating that it is an error on valuation. The tax difference is $50,790; dividing this in half, we arrive at the $25,395 error in "valuation." It is obvious that the entire decision of the trial court was based upon liquidation. In support of my position, I cite *Krage v. Krage*, 329 N.W.2d 878, 880 (S.D.1983):

> The trial court apparently had a pattern according to which it distributed the marital property. Similarly, we noted a pattern of distribution in *Wallahan [v. Wallahan,* 284 N.W.2d 21 (S.D.1979)]* in which we stated, "[i]t is clear from the decree in this case that the trial court attempted to create a scheme of distribution which would take into account as fully as possible any immediate tax consequences without indulging in speculation as to possible tax liabilities which

might theoretically arise." 284 N.W.2d at 26. We are hesitant to modify a judgment that follows a well-considered pattern of distribution. (Footnote omitted.)

There was a well-considered pattern of distribution in this case. We should not transmogrify it. The transmogrification should not result from a quest to punish this doctor who wishes to change his life. Yes, indeed, Dr. Kelley's decision was in his complete control. Is it wrong to heal the sick, help the poor, clothe the naked, or feed the hungry?* If Dr. Kelley wishes to leave the pursuit of the buck, so let it be and let him embark upon a new journey in life. This choice is his, and does not belong to his ex-wife or the court system. Are we not granted by the framers of the Constitution "the pursuit of happiness"? Tax consequences should not be stripped from the package of the pattern of distribution which the trial judge devised. It was necessary for Dr. Kelley to liquidate his professional interests to pay the shortfall in the property distribution which Penelope Kelley desired. As I understand it, the court made a finding that it would not be reasonable after his resignation from the practice of pathology to expect him to leave his professional investments in place or for his former colleagues to allow such professional investments to continue. It is clear that the trial court believed, and found, a necessity for the liquidation of assets to fulfill the pattern of distribution. When the hammer of liquidation of assets falls, a resulting tax consequence is triggered. Here, the tax ramifications were not speculative; rather, they were realistic and certain. Penelope Kelley owes a duty not just to share in the pluses but to also share in the minuses. By her brief and argument, she declines any part of the tax liability.

With the handsome award of property and generous rehabilitative alimony award, Penelope Kelley is not satisfied by the

---

* Thank God there are those of us who forsake the material goods in the world—to pursue works of charity and goodness. I am reminded of Thoreau's words: "If a man does not keep pace with his companions perhaps it is because he hears a different drummer. Let him step to the music he hears however measured or far away."

great compassion shown to her by the trial court and the equity it attempted to devolve upon her.

Finding of Fact No. 20 should be set forth in extenso for the readers' appreciation. Spiritually, and factually, it is against the writing of the majority opinion and the special concurrence. It provides:

> That items two and three of finding nineteen above are after tax values as the Court finds that the liquidation of these items by Plaintiff is a definite certainty under the circumstances. Plaintiff has resigned effective year end 1984. After his resignation it is not reasonable to expect him to leave the investments in place or his former colleagues to allow it. It is unlikely that leaving such an investment in place would be practical especially considering his plans to leave the country. Also, in order to provide Defendant with the shortfall property distribution she is entitled to it is necessary for the funds to be liquidated. The tax ramifications are not speculative they are realistic and certain and represent a diminution in asset valuation which would occur if the parties weren't getting a divorce. The tax consequences of a partial distribution of items two and three in paragraph nineteen above are unacceptable in view of the fact that Plaintiff can receive favorable tax treatment under the long term capitol [sic] gain provisions and the special pension and profit sharing provisions of the internal revenue code.

This Court now changes the pattern of distribution of marital property. It rests upon a holding, apparently, that the above finding is clearly erroneous for lack of proof. Can there be, however, a clearly erroneous finding of fact of $50,790 on valuation, when it is cleaved nicely in half, to the penny, and Dr. Kelley is required to pay all of the tax consequences of liquidation? Here, we see a conceptual end run it should be tackled and knocked to the ground for its fallacy.