**Bernetta M. CONNELLY, Plaintiff and Appellee,**

v.

**James Keith CONNELLY, Defendant and Appellant.**

**No. 14457.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 24, 1984.

Decided Feb. 6, 1985.

Thomas K. Wilka of Hagen & Wilka, Sioux Falls, for plaintiff and appellee.

Paul E. Mundt, Sioux Falls, for defendant and appellant.

FOSHEIM, Chief Justice.

Bernetta M. (wife) and James Keith (husband) Connelly were divorced after twenty-two years of marriage. Husband appeals. We affirm.

Husband claims the court's decision to grant wife a divorce; alimony of $1,500 per month; and possession of the home until July 1, 1984, all lack sufficient evidentiary support.

The record indicates wife fulfilled traditional family responsibilities. She gave up her teaching career, and cared for the home and children. She was frugal when the family started out with little money, and she worked outside the home when necessary to supplement the family income. She cared for husband at home after his 1977 heart attack. Husband also had a

drinking problem. The trial court found wife suffered worry, anxiety, and emotional distress. We cannot conclude that the findings of fact and conclusions of law of the trial court granting wife a divorce were clearly erroneous. SDCL 15–6–52(a).

Husband assails wife's claims concerning his alcohol problem, contending the evidence does not show a use of intoxicating liquor which meets the requirements of SDCL 25–4–16. Habitual intemperance was not alleged, or found, as a ground for the divorce. Husband's drinking habit could nevertheless be a factor which the court could consider in finding grievous mental suffering upon the wife pursuant to SDCL 25–4–4. *See, Phutzenreuter v. Phutzenreuter,* 76 S.D. 276, 77 N.W.2d 563 (1956); *Baker v. Baker,* 252 Iowa 1161, 110 N.W.2d 236 (1961); *Lawler v. Lawler,* 175 N.W.2d 103 (Ia.1970); *Knapton v. Knapton,* 28 Mich.App. 316, 184 N.W.2d 207 (1970).

Husband argues the alimony award should be governed by *Hanks v. Hanks,* 296 N.W.2d 523 (S.D.1980) rather than *Guindon v. Guindon,* 256 N.W.2d 894, 898 (S.D.1977). Wife's conduct can hardly be compared with the wife's misconduct in *Hanks, supra.* (Wife in *Hanks* left 4 children, ages 8–18, for an indefinite period to pursue an adulterous relationship). In addition, the wife in *Hanks, supra,* was fully employed at the time of trial. Mrs. Connelly is unemployed. Despite her educational level, the trial court found her re-entry into the job market will be difficult and require preparation. The evidence indicates husband has health problems and consequently may be forced into early retirement. The trial court obviously took this into consideration. The judgment provides that in the event husband retires at age 55 or older, wife's alimony will be decreased to one-third of his retirement benefits, excluding social security. The alimony award was compatible with the evidence concerning husband's earning capacity.

Husband's claim the court erred in allowing wife sole occupancy of the home is moot since the house was sold July 4, 1984. *See, Matter of Silver King Mines Permit Ex–5,* 315 N.W.2d 689, 690 (S.D.1982); *Rapid City Journal v. Circuit Court, etc.,* 283 N.W.2d 563, 565 (S.D.1979).

Wife's request for appellate attorney fees of $1,275.00 meets the considerations of *Peshek v. Peshek,* 297 N.W.2d 323 (S.D. 1981) and *Lien v. Lien,* 278 N.W.2d 436 (S.D.1979), and is granted.

The judgment is affirmed.

WOLLMAN and MORGAN, JJ., and WUEST, Circuit Judge, acting as a Supreme Court Justice, concurs.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

Perhaps the origin and existence of alimony should be mentioned, however briefly, in order to understand not only this dissent but my past dissents on alimony in this Court. Literally, alimony signifies nourishment or sustenance. It is a monetary provision which the law may afford to a wife from her husband's estate so that she may have food, clothing, habitation, and other necessaries for support. *Bradley v. Superior Court,* 48 Cal.2d 509, 310 P.2d 634 (1957). The term "alimony" is derived from the Latin word "alimonia," *see Eaton v. Davis,* 176 Va. 330, 10 S.E.2d 893 (1940), and, in its origin, was a method by which the spiritual courts of England enforced the duty of support owed by the husband to the wife; however, this was only during such time as they were legally separated pending the marriage relation. Evolution in domestic relations law has swept this concept into oblivion. Obviously, even in the days of womanhood obtaining over one-half of the jobs in America, it is not for a woman to bask in luxury nor to enjoy fripperies.[1] Alimony is generally

1. According to the 1980 Federal Census, of which I take judicial notice, males 16 years and over comprised 48% of the working force, 81,- 732,090; females 16 years and over comprised 52% of the working force, 89,482,168. *Source:* 1980 Census, United States Summary, Ch. C,

held to have as its basic purpose the support of the wife and is not intended as a penalty against the husband. A wife must establish not only that she is married but that she is entitled to support and that the husband is able to pay it. Although seemingly not a requirement for an award in this day and age, alimony was historically created so that a wife would not become a public charge. Several authorities hold the underlying policy on alimony statutes is not punishment for a wrongdoing husband, but rather to insure that where the wife is entitled to support, she will receive it, and not become a public charge. *Tobey v. Tobey*, 165 Conn. 742, 345 A.2d 21 (1974); *Putnam v. Putnam*, 5 Mass.App. 10, 358 N.E.2d 837 (1977), *appeal after remand*, 7 Mass.App. 672, 389 N.E.2d 777 (1979); *Gugliotta v. Gugliotta*, 160 N.J.Super. 160, 388 A.2d 1338, *aff'd*, 164 N.J.Super. 139, 395 A.2d 901 (1978); *Covert v. Covert*, 48 Misc.2d 386, 264 N.Y.S.2d 820 (1965); *Wheeler v. Wheeler*, 88 U.S.App.D.C. 193, 188 F.2d 31 (1951); *Buehler v. Buehler*, 373 Ill. 626, 27 N.E.2d 466 (1940); *Warner v. Warner*, 219 Minn. 59, 17 N.W.2d 58 (1944). A divorced wife who is capable of assisting herself should have no right to insist that her husband maintain her in either idleness or luxury. Alimony's basic purpose is to estop economic want and is basically a statutory substitute for the marital obligation of a husband to support his wife. There are three states which do not recognize alimony at all, North Carolina, Pennsylvania, and Texas. "It should not be suffered to convert a host of physically and mentally competent women into an army of alimony drones." *Doyle v. Doyle*, 5 Misc.2d 4, 7, 158 N.Y.S.2d 909, 912 (Sup.Ct.1957). In the case before us, wife will receive $18,000.00 per year net income as an alimony award. The courts have often pointed out that a wife should not receive so much alimony from her husband so as to have her remain idle. *Schwent v. Schwent*, 209 S.W.2d 546 (Mo.App.1948). At $18,000.00 per year guaranteed income,

*General Social and Economic Characteristics,* Vol. 1, "Characteristics of the Population." A vast social change has occurred in the status of

the wife's motivation to work and secure full-time employment is stultified and chilled. Alimony, if unwarranted or excessive, can be a repressive influence rather than a good influence on a person's life.

The trial courts of this state, under SDCL 25–4–41, obtain their power to grant "alimony":

Where a divorce is granted, the court may compel one party to make such suitable allowance to the other party for support during the life of that other party or for a shorter period, as the court may deem just, having regard to the circumstances of the parties represented; and the court may from time to time modify its orders in these respects.

Whereas, the Supreme Court of this state should act as a safety valve for, under SDCL 25–4–46, it is provided that:

[A]ll orders and decrees touching the alimony and maintenance of a spouse ... are subject to revision on appeal in all particulars, including those which are stated to be in the discretion of the court.

Therefore, the legislature has specifically engineered a review procedure and empowered the Supreme Court of this state to revise alimony "in all particulars." Our trial courts are the first breath and the Supreme Court is the last breath on the propriety of alimony awards in this state.

Historically, this Court has taken the position that it will not disturb a decision of the circuit court upon an award of alimony unless there is an abuse of discretion. *Wallahan v. Wallahan*, 284 N.W.2d 21, 26 (S.D.1979). Although counsel and the Bench might well argue on any given set of facts well into the night as to abuse of discretion or not, unless practicality is breathed into that phrase, we have Equity only from On High. An "abuse of discretion" refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. This lesson we are told in *Herndon v. Herndon*, 305

women since alimony was birthed as a legal concept in the spiritual courts of England.

N.W.2d 917, 918 (S.D.1981). We may safely conclude that although the trial court's discretion is a broad one, and it should be, it is not an uncontrolled discretion. Indeed, it must be soundly and substantially based upon the evidence. *Owen v. Owen,* 351 N.W.2d 139 (S.D.1984).

With the above general principles and rules of review in mind, I cite a case which sets forth the criteria in awarding alimony, *Morrison v. Morrison,* 323 N.W.2d 877, 878 (S.D.1982). We held that:

> In awarding a support allowance, whether it be specific property, a lump sum of money, or periodic payments, the trial court must consider the following factors:
>
>> (1) the length of the marriage; (2) the parties respective earning capacity; (3) their respective financial condition after the property division; (4) their respective age, health and physical condition; (5) their station in life or social standing; and (6) the relative fault of the parties in the termination of the marriage.

With these above factors as a guide, we should examine the facts of this case. Before doing so, reference is made to *Martin v. Martin,* 358 N.W.2d 793, 801 (S.D.1984) (Henderson, J., concurring in part, dissenting in part), and a polestar case cited in the dissenting opinion therein, *Grant v. Grant,* 5 S.D. 17, 57 N.W. 1130 (1894). *Grant,* in an abundance of good sense, ruled that this Court should consider not only what the wife should have, but what the husband can and ought to pay. We shall now address the facts. Without understanding the facts, the reader is caught up in an iridescent cloud of sheer theory. Facts can dissipate a rainbow.

The parties were married 22 years. Husband's earning capacity is good. For several years, he has been an office manager of an insurance adjustment company. His after-tax income in 1982 was $40,374.42; in 1981, his after-tax income was $41,865.99.

His income can fluctuate greatly depending upon hail, casualty, and act-of-God losses which can generate business. Wife is a college graduate with a Bachelor's Degree in English, a minor in Education, and has renewed her certificate to teach in South Dakota. She earned her Master's Degree, all financed by her husband, in Selective Studies from the University of South Dakota in 1982, apparently fortifying herself to teach full time or to earn a living in the Humanities. Husband purchased a car for her so that she could drive to and from the State University, a distance of approximately 60 miles. Wife, although it appears in proceedings subsequent to the appeal, and therefore technically not before this Court, apparently secured a position after the divorce trial and earns upwards to $1,000.00 per month.[2] If this is not to be considered on appeal, then certainly her Master's Degree and educational background must be considered in determining the depth of her earning capacity. In the past, she has spasmodically worked as a teacher, in Dakota Industries in Sioux Falls, and as a furniture upholsterer. From 1961 through 1977, she earned $20,595.00 per Exhibit 2, received in evidence. In the late 1970's, she taught at an elementary school for a full year. She therefore possesses work skills and a very fine education which her husband just completed paying for. The respective financial condition of the parties after the property division is equal. If there exists any disparity in worldly belongings after implementation of the divorce decree, it is miniscule. Equity in the family home of $46,000.00 was divided equally; equity in personal property and motor vehicles of $38,000.00 was divided equally; checking accounts, stock shares in several companies, and precious metals of $38,869.55 was also divided equally. Additionally, the parties owned custodial accounts in stock and money funds for the benefit of their daughters valued in the amount of $20,000.00, which were set aside by the parties for college

---

**2.** An alimony modification proceeding is apparently being held in abeyance pending the outcome of this appeal.

educational expenditures for their daughters, although these funds were recognized within the family as a "slush fund" to meet any emergencies. Wife kept, additionally, a Home Federal Savings and Loan Association account with a balance thereon of $2,121.22. Wife transferred $2,000.00 to her personal account from a joint checking account, shortly before instituting a divorce action. This was to gird her for litigation. Wife, let there be no doubt about it, by virtue of the property division, is in a comfortable, although not regal, status. Continuing with our evaluation of alimony under the *Morrison* and *Guindon* factors, husband was 45 and wife 44 years of age at time of trial. Wife enjoys excellent health. Her brief states: "Mrs. Connelly has no health or physical problems." Husband, to the contrary, has a very serious heart condition which manifested itself in a near-fatal heart attack in 1977. This was complicated by the onset of a ruptured appendix. Husband nearly died. Per Exhibit R, McGreevy Clinic, through Dr. John T. Langdon, M.D., duly received in evidence, and there being no evidence to the contrary in the record, husband has a continuing, active coronary disease syndrome with evidence of angina pectoris. Husband must take, daily, cardiac medications. These consist of 9 mg. Nitrobid, 10 mg. Blocadrin, and 50 mg. Timolol Dipyridimole, twice daily. As needed, husband also takes Nitroglycerine. Notwithstanding this heart condition, husband works daily. He takes a long lunch break and for relaxation has followed the role of an ardent hunter and fisherman. Wife expressed that she did not want to spend the rest of her life watching him fish. Wife, as will be developed below, wants "freedom." Husband's health is a definite factor in an early retirement program. At the trial, he testified that he anticipated retiring at the age of 55. Hence, I assume, the structuring of the divorce decree such as it was done by the trial court. Both parties, in their briefs, specifically state that with respect to the factor of station in life or social standing that it is "comparable with one another." Apparently, there is equality here, but equality of what? It is noted that both are college graduates and have enjoyed a good standard of living. One might classify them as middle class Americana. Both have professional colleagues and associates; they are both attuned to the business world (wife testified she made out the joint income tax returns, wrote checks, knew about the investments). Husband decided upon the type of investments. Wife, as I shall detail below, has an inordinate interaction with people in the City of Sioux Falls, this state's largest city. Because of the heart attack, and doctor's advice, husband has become an outdoorsman. This now takes us to the relative fault of the parties which brought about the termination of the marriage. As fault is to be considered as a factor, and the majority opinion has not covered this from both sides of this lawsuit, I shall.

Although the majority opinion points out that wife was granted a divorce from husband, it does not mention that husband was also granted a divorce from wife on the grounds of extreme cruelty in that she inflicted grievous mental suffering upon him. Husband testified that wife was belligerent, arrogant, and self-righteous. She repeatedly told him their life-style was "superficial." Wife was a true believer in the women's liberation movement. Although claiming that she was a traditional housewife and mother, she absented herself from her home and actively took part in the following organizations: Board Member of Citizens Against Rape and Domestic Violence, Domestic Violence Coordinator, Representative at Women's Network, counsels at St. Lamberts, started the "Tough Love" Group, Women's Political Caucus, Parents Anonymous, Domestic Hot Line, Volunteer at Children's Inn, Outstanding Volunteer for Crisis Intervention, Caring Parents, Family Violence Task Force, and sat through a publicized trial known as the Ridenour Trial (writing an editorial and letters).[3] When husband wanted her to go

---

**3.** She testified: "I think as far as where we were at, we were not working on the same things or going towards the same goals or talking about the same issues."

with him on a vacation to Nevada, she had "other things" to do. When he tried to buy her a ring on Valentine's Day, she could not find a ring in a prominent Sioux Falls mall to satisfy her. As a result, she rejected a diamond ring from her husband on Valentine's Day. She did not like to come home, at lunchtime, to have lunch with her husband. It adversely affected her various activities. She was taken up—if not obsessed—in affairs which were not "traditional." At her insistence, husband paid for a Master's Degree at the University of South Dakota which encompassed a little over two years in part-time studies as a nontraditional student. She characterized herself as an "economic hostage" during the marriage but she was free to write checks, make the deposits, knew of the investments, made out the income tax, and wrote cash checks at grocery stores in Sioux Falls for "discretionary reasons." In addition, she had five major credit cards at her disposal. Photostatic copies of same are on file herein. In her marriage, she longed for "freedom." She apparently took the position during the marriage, and during the divorce proceedings, that husband was niggardly with her but the entire record suggests that she wanted for absolutely nothing in the basics of life or to conduct the type of life that she preferred. She was interviewed by the *Argus Leader* which triggered newspaper articles and the television media spawning several appearances concerning her work in the above organizations. She was front and center in the news media in the largest city of this state, yet she is described as a mother with traditional activities. From what I can glean from the record, she made a speech to trial judges of the circuit in which her case was ultimately decided; and, notwithstanding all of this flurry of activity, made trips to the state capitol at Pierre in furtherance of her interest in various movements. Wife lectured at Augustana College and took numerous trips to Iowa pursuing her various interests. Within a short time after her presentation to the circuit court judges, she filed divorce proceedings against her husband in the same circuit. Despite all of the above facts, she is depicted as a "traditional wife." By her own admissions, she spent less than half of her days at home. Ultimately, she, who regarded herself in testimony as a social problem counselor and problem solver, refused to go to counseling when matrimonial waters became troubled. Her justification for non-counseling was bedded in her belief that there was no solid relationship in the marriage. She testified "I didn't feel a need." Wife simply became tired of her husband and her way of life and she wanted "freedom." This is established by the record. Husband testified, in attempting to refute her cause of action, that she recalled all of the bad and none of the good. The circuit judge granted a divorce against her because of her treatment of her husband. Therefore, the fault is surely not all against this husband. Ought this husband pay open-ended alimony, for a lifetime, under the circumstances outlined above? She secured the "freedom" that she so desperately wanted but still wants to impose upon her husband an obligation of lifetime support. By any stretch of the imagination, can this be deemed to be equitable?

Notwithstanding the display of her "liberation" and her desire for "freedom," she insisted in alimony of $2,400.00 per month at the trial level but was awarded $1,500.00. In fairness to her, four children were raised in this marriage and, like all mothers, she made a sacrifice for these children and sublimated herself thereby to the career of her husband, the breadwinner. She should not be turned out into the cold, penniless, to fend for herself. As I have detailed above, she has received one-half of all of the real and personal property in this marriage and has a wonderful education upon which to build her own career—a career which she wanted more than marriage. It is difficult to understand how she can have it both ways, that is, a career wherein she is totally independent and yet

receive an amount of $18,000.00 per year alimony which would permit her to sit idle. Husband's heart condition is of deep concern to me and he should not be required to literally work himself to death to accommodate her new liberation and freedom. In the exhibits presented, wife presented a budget calling for, among other things, $50.00 per month for professional continuing education; clothes requirement, $225.00 per month; phone bill, $150.00 per month; entertainment, $85.00 per month; and "food in-home entertaining," $400.00 per month. Under the decree, the wife is awarded $300.00 per month child support for a girl in senior high school for the months of November 1983 through June 1984. There is an obvious puffing of food requirements and there was a general inflated living expense budget submitted to the trial court. I fully appreciate that the trial court cut the $2,400.00 request for alimony to $1,500.00 per month alimony. Still, I am convinced that under all of the circumstances, the $1,500.00 per month alimony award is excessive under the guidelines of *Morrison* and *Guindon*. The inflated budget of the wife was tendered to obtain a high award of alimony. The award of alimony in such an amount is not justified by, and clearly against, reason and evidence. The evidence, outlined above, simply does not justify an award of $18,000.00 per year. It is obvious that this wife will not become a public charge considering the property division that she received. Here, and as we expressed in *Goehry v. Goehry*, 354 N.W.2d 192, 194 (S.D.1984) (emphasis supplied), "[t]he trial court's award of alimony and the division of property *are considered together* on appeal to determine whether the trial court abused its discretion. *Krage v. Krage*, 329 N.W.2d 878, 879 (S.D.1983)...." Wife should not be permitted to sit in idleness. We should recognize that wife is highly educated, in excellent health, and able to support herself. Finding of Fact 15 provides, inter alia, that "plaintiff must now re-enter the work force at age 45, which has and will be difficult, given her age and educational background." That she must re-enter the work force at age 45 might well be accepted, but the fact that it will be difficult because of her educational background is clearly against reason and evidence. Before she received her Master's Degree, at one time she had a full-time teaching position. The finding beggars reality.

Not only is the award of alimony excessive, it is geared to a mathematical formula in the future. This formula, namely "Plaintiff shall receive alimony equal to one-third of Defendant's retirement income, excluding Social Security benefits" (Finding of Fact 15), cannot consider the conditions that exist at the time defendant retires at the age of 55. It is a projection of alimony in the future without knowing what the facts are in the future. When husband retires at the age of 55, his health could be far worse than it is now; the wife's income could be far greater than it is now. This is but one hypothesis. It is, in effect, an anticipatory judgment.

I further dissent upon the basis that this is an "open-ended" alimony award. The award has no specified period of time and fails to take into consideration whether she should become married in the future. It is true that wife is not as young as the wife in *Hanks v. Hanks*, 296 N.W.2d 523, 527–28 (S.D.1980). But we did therein state:

> Our principal and strongest objection to the award is the failure of the trial court to provide for termination of the payments upon appellee's remarriage.... The trial court should have anticipated that a woman of appellee's age and education would enter into another marriage.

This Court should reverse and remand this case with instructions to modify the alimony award for the reason that it is excessive, open-ended, and is geared to a rigid mathematical formula in the future without regard to the facts which could exist in the future; and, particularly, that an award of alimony, if any, consider her present employment and the evaluation factors under *Morrison* and *Guindon*.

Work. It is one of God's greatest gifts to man. How foreign it is to some and a constant companion of others. In law, we should encourage and laud it.