Judith L. TEMPLE, Plaintiff and Appellee,

v.

Douglas L. TEMPLE, Defendant and Appellant.

Nos. 14293, 14310.

Supreme Court of South Dakota.

Considered on Briefs March 23, 1984.

Decided March 20, 1985.

Dennis H. Hill of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, for plaintiff and appellee; Thomas W. Stanton of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, on brief.

Ronald W. Banks of Banks & Johnson, Rapid City, for defendant and appellant; Ann C. Jones of Banks & Johnson, Rapid City, on brief.

MORGAN, Justice.

Douglas L. Temple (Douglas), the defendant in the underlying divorce action, appeals from the portion of the trial court's divorce decree which awarded the plaintiff, Judith L. Temple (Judith), alimony and attorney fees and from the property division, particularly the portion which included twenty-five percent of certain Pitchfork Ranch assets and improvements to a house owned by Douglas' mother, Georgiana Temple (Georgiana), in the marital estate. Judith filed a notice of review based on her contention that one-half, rather than one-fourth, of the ranch assets should have been included in the marital estate. We affirm.

Douglas and Judith had very few assets when they married in 1959 at approximately ages 18 and 16 respectively. In 1961, Douglas inherited $13,515, including a one-half interest in 480 acres of deeded land from his father, Allen Temple (Allen). Georgiana acquired sole ownership of all land and property held jointly with her husband, Allen, and approximately $277,295 in land, equipment, livestock, and cash through inheritance when he died. The trial court found that these assets, along with assets she owned individually before Allen's death, were used for the operation and expansion of the ranch and were generally considered ranch assets at the time of the trial.

From the beginning of the marriage in 1959 until 1972, Douglas worked full-time on his family's ranch. He was paid $125 per month and was permitted to raise his own cattle herd of approximately sixty cows on the ranch. During this time, Douglas apparently covered his and his family's personal expenses with additional draws from the operation. In 1972 Douglas and Georgiana reached an agreement under which he was to receive a one-fourth interest in the profits generated by the ranch in exchange for his services as Ranch Manager. Since 1972, Douglas has substantially increased the Pitchfork

Ranch profits which, throughout Douglas' tenure at the ranch, have been plowed back into the operation for the accumulation of ranch assets. Capital generated by the ranch was primarily used to purchase land which was titled to Douglas and Georgiana in joint tenancy.

The trial court found that Douglas was able to accumulate the assets and benefits that constitute the Pitchfork Ranch operation and Douglas and Judith's marital estate because of the business relationship between Douglas and Georgiana. Georgiana drew approximately $6,000 per year from the ranch operation to cover her personal expenses. Although the amount Douglas withdrew for his family's expenses was somewhat greater, evidence and testimony was presented which indicated that the parties lived moderately. The trial court specifically found that remaining ranch profits were used to acquire land and other property and to pay other costs of expansion.

The trial court also found that under the agreement between Douglas and Georgiana, alloting Douglas one-fourth of the ranch operation profits, Douglas was intended to receive a one-fourth interest in the value generated to the ranch.[1] As a result of this finding, twenty-five percent of Pitchfork Ranch assets the trial court found to have been acquired with profits from the ranch operation were included in the marital estate. The total fair market value of the ranch assets acquired in this manner was $1,292,477 at the time of trial. Total ranch liabilities at that time were $16,000.

The trial court found that as a result of Douglas' service as Ranch Manager under his 1972 agreement with Georgiana, he had an interest in twenty-five percent of the ranch assets, reduced by twenty-five percent of ranch liabilities. The trial court apparently determined Douglas' interest in Pitchfork Ranch under the laws governing partnership and decided that Judith's argument, that the law of joint tenancy gov-

---

1. Douglas stated in Defendant's Answers to Plaintiff's Interrogatories, dated January 22, 1981, that he owned a "One-quarter interest in the Pitchfork Ranch." (Interrogatory 50).

erned, was not supported by the facts of this situation. The trial court also included assets that Douglas owned individually or jointly with Judith in the marital estate. The trial court valued these total individual assets at $565,533 and the total individual liabilities at $32,150 and added $533,383 to twenty-five percent of the net value of the ranch assets to arrive at the marital estate. After arriving at the net marital estate, the trial court properly considered the six factors set out in *Hanson v. Hanson*, 252 N.W.2d 907 (S.D.1977), in order to equitably divide the property.

The trial court worked out an intricate plan in order to protect Pitchfork Ranch as an ongoing enterprise and ruled that Douglas should pay Judith the dollar value of a proportionate amount of the net marital estate, which included Douglas' share of the ranch assets. The trial court awarded Judith specific assets valued at $16,194 and a cash award of $310,000 as her share of the marital estate.[2] Douglas was awarded the land, the leases and mineral interests, the livestock and equipment, certain personal property and bank accounts, and all of the parties' liabilities. Judith was also awarded $500 per month alimony and Douglas was ordered to pay her attorney fees.

Douglas has raised four issues in his appeal: (1) Whether the trial court was inconsistent and erroneous when it initially found that Douglas had agreed to accept twenty-five percent of the ranch *profits*, and then included twenty-five percent of the ranch *assets* in the marital estate? (2) Whether the trial court erred when it included improvements to the parties' residence, located on Georgiana's land, in the marital estate and, thereby, among the assets subject to division? (3) Whether the trial court abused its discretion when it awarded Judith alimony? (4) Whether the trial court abused its discretion when it ordered Douglas to pay Judith's attorney fees?

The rationale behind the property division plan and the alimony award is set out in the trial court's Findings of Fact and Conclusions of Law. This court reviews a trial court's findings of fact under the "clearly erroneous" standard and overturns a trial court's conclusions of law only when the trial court has erred as a matter of law. *Wefel v. Harold J. Westin & Associates, Inc.*, 329 N.W.2d 624 (S.D.1983); *Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292 (S.D.1982).

In applying the clearly erroneous standard, this court's function is not to decide factual questions *de novo*. The question is not whether this court would have made the same findings the trial court made, but whether on the entire evidence this court is left with a definite and firm conviction that a mistake has been made. *Cunningham v. Yankton Clinic, P.A.*, 262 N.W.2d 508 (S.D.1978); *In Re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). The trial court's findings of fact are presumptively correct and the burden is upon appellant to show error. *Hilde v. Flood*, 81 S.D. 25, 130 N.W.2d 100 (1964).

With respect to property divisions in divorce actions, the trial court has broad discretion and its judgment will not be set aside unless it clearly appears that the trial court abused its discretion. *Prentice v. Prentice*, 322 N.W.2d 880 (S.D.1982); *Laird v. Laird*, 322 N.W.2d 254 (S.D.1982); *Palmer v. Palmer*, 316 N.W.2d 631 (S.D. 1982). This court's review is limited to a determination of whether there was an equitable property division. *Krage v. Krage*, 329 N.W.2d 878 (S.D.1983).

Douglas argues first that while his 1972 agreement with Georgiana entitled him to twenty-five percent of the ranch *profits*, the trial court included twenty-five percent of the ranch *assets* in the marital estate. Douglas also contends that certain livestock and realty improvements which be-

---

**2.** The sum of $75,000 to be paid within ninety days of the decree and the balance in twenty equal annual installments at ten percent (10%) interest on the unpaid balance from year to year. Prepayment was permitted without penalty.

long to Georgiana were characterized as ranch assets and improperly placed in the marital estate.

■ Given the variety and extent of the ranch assets, the informality of the 1972 agreement, and the absence of bookkeeping records, it would have been impossible to precisely designate the ownership of each ranch asset at the time of trial. In his reply brief filed with this court, Douglas cites SDCL 48–4–2 for the proposition that "property acquired with partnership funds is partnership property." When dividing property, trial courts may consider when and how property was acquired. *Swenson v. Swenson,* 85 S.D. 320, 181 N.W.2d 864 (1970). The trial court characterized all property that was not clearly owned by Douglas or Georgiana individually as ranch property. The trial court then treated their business relationship as a partnership and allocated a share of the total ranch assets to each of them, based on the percentages found in the 1972 agreement. The trial court allocated Georgiana seventy-five percent and Douglas twenty-five percent of the ranch operation.

■ A partnership is an association of two or more persons who carry on a business as co-owners. *Fredrickson v. Kluever,* 82 S.D. 579, 152 N.W.2d 346 (1967). There is no arbitrary test for determining the existence of a partnership; therefore, each case is governed by its individual facts and the existence of the relationship is a question for the trier of fact, except when the evidence is conclusive. *Widdoss v. Donahue,* 331 N.W.2d 831 (S.D.1983); *Munce v. Munce,* 77 S.D. 594, 96 N.W.2d 661 (1959). The existence and scope of a partnership may be evidenced by a written or an oral agreement, or implied by conduct of the parties. *Lewis v. Gallemore,* 173 Neb. 211, 113 N.W.2d 54 (1962); *Gangl v. Gangl,* 281 N.W.2d 574 (N.D.1979).

■ We agree that the Douglas-Georgiana relationship is most properly characterized as a partnership. Douglas and Georgiana obviously considered themselves partners when they worked out the 1972 agreement to share profits. SDCL 48–3–8. The fact that Douglas and Georgiana owned property in joint tenancy and shared the profits from the property does not, standing alone, establish a partnership. (SDCL 48–1–6). The rules used to determine whether or not a partnership exists are found in SDCL 48–1–5 to 48–1–8. Receipt of a share of the profits of a business is prima facie evidence of partnership status. SDCL 48–2–8. The trial court specifically found that the assets Georgiana received upon her husband's death and her other individual assets were used in the operation and expansion of the Pitchfork Ranch and remained a part of the operation at the time of trial. Property originally brought into a partnership and property subsequently acquired on account of the partnership is partnership property. SDCL 48–4–1. Property acquired with partnership funds is also partnership property. SDCL 48–4–2. The seventy-five percent of the ranch assets carved out for Georgiana easily encompassed and exceeded the value of the property she acquired and owned prior to her 1972 agreement with Douglas and the proportion of the share designated to her is the same as provided by that agreement.

■ The trial court's inclusion of twenty-five percent of the ranch assets in the marital estate is not inconsistent with its finding that Douglas and his mother agreed that he would share twenty-five percent of the profits. The ranch expansion and the acquisition of the assets resulted directly from the ranch profits and were the fruit of his family's labor and sacrifice. Apparently, in this unique and industrious family operation, almost every penny above basic minimal expenses was plowed back into the operation. The only partnership "profits" available for allocation to the partners are in the ranch assets and because funds, assets, and expenses have been intermingled for twenty years, it has become almost impossible to distinguish individual marital property from ranch property.

■ SDCL 48–4–2 provides: "Unless a contrary intention appears, property acquired with partnership funds is partnership property." The evidence here is sufficient to show that the parties intended a 75/25 split of the ranch assets that were acquired with ranch profits. The rights of partners in relation to the partnership are determined, subject to any agreement between them, by the rules set out in SDCL 48–3–2 to 48–3–9, inclusive. SDCL 48–3–1. *See Brooks, Inc. v. Brooks,* 86 S.D. 676, 201 N.W.2d 128 (1972). All property acquired by the partnership with partnership funds is partnership property (SDCL 48–4–1, –2) and each partner has property rights in specific partnership property. SDCL 48–4–10. Partners hold their interests in specific partnership property as tenants in partnership, not in joint tenancy. The property acquired with partnership funds may be treated as partnership property in accordance with the terms of the agreement between Douglas and Georgiana.

Title does not control the distribution of property in a divorce action. SDCL 25–4–44. In *Shumway v. Shumway,* 106 Idaho 415, 679 P.2d 1133 (1984), the Supreme Court of Idaho held that an interest in farm property acquired as a gift to one party in a marriage may be considered separate property, but a partnership interest in a farm operation may be divided.

■ The law is clear that a wife's performance of typical domestic duties as a housewife and mother constitutes a valuable contribution to the accumulation of property, i.e., farm or ranch property. *O'Connor v. O'Connor,* 307 N.W.2d 132 (S.D.1981); *Kittelson v. Kittelson,* 272 N.W.2d 86 (S.D.1978). Douglas and Judith were married for twenty-two years and together raised six children. They had very little property when they married and with Georgiana's help built a sizeable ranch operation.

■ In *Prentice, supra,* this court held that the trial court abused its discretion when it failed to divide farm property as part of the marital estate. The husband in *Prentice* took over a farm upon which his father had paid half of the purchase price. The parties to the divorce paid off the balance due on the farm from farm proceeds and this court held that the husband's interest in the farm should be divided between them as part of the marital estate. The *Prentice* Court found that the wife helped pay off the balance due on the farm, that together they improved the residence, and that both parties worked to increase the size and value of the farm; consequently, the wife was entitled to a share of her husband's interest in the farm operation. Given the expansion and increased value of the ranch in this case, the situation is similar to that presented in *Prentice* and the substance and result of the Douglas-Georgiana agreement must be considered over its form. Judith is entitled to a share of Douglas' interest in the ranch.

Douglas also contends that the trial court was clearly erroneous when it included improvements to the parties' home in the marital estate. The residence is located on real property owned by Georgiana. The trial judge found that the total value of the residence, $10,750, encompassed improvements valued at $10,000. The money for the improvements came from ranch profits and $10,000 was therefore added to the total Pitchfork Ranch assets, one-fourth of which then went into the marital estate.

■ A divorce court must consider equity and the circumstances of the parties when it divides the marital property. SDCL 25–4–44. "Tracing" is an equitable principle which allows a party with the right to property to trace that property through any number of transactions in order to reach the final proceeds or result. In *Shumway, supra,* the parties' house was built on the husband's parents' property with partnership funds. The husband argued that consequently the house belonged to his parents and was not a partnership asset. *Id.* The Idaho Supreme Court refused to disturb a magistrate's finding that partnership funds paid for the house and that Court then looked to the Uniform Partnership Act, adopted in South

Dakota at SDCL Title 48, for the proposition that property acquired with partnership funds is partnership property. *See* SDCL 48-4-2.

■ Under the 1972 agreement, Douglas was to stop paying personal expenses with ranch funds, thus the $10,000 expended for home improvements should actually have been profit for the ranch operation. We agree that Judith is entitled to a share of all profits generated to Pitchfork Ranch, including the $10,000, and she may trace the profits to the improvements and obtain her share of their value. Douglas may not shelter the entire $10,000 under the legal principle that property affixed to realty, including building improvements, becomes the property of the owner of the realty. *Cf.* 63 Am.Jur.2d § 16, *Property Affixed to Realty;* SDCL 43-1-2, -3.

■ The third issue raised on this appeal is based on Douglas' contention that the trial court, in light of the $310,000 property award to Judith over twenty years, abused its discretion when it further awarded her $500 per month alimony. We note, as we did in *Krage, supra,* and *Wallahan v. Wallahan,* 284 N.W.2d 21 (S.D. 1979), that this court will hesitate before modifying judgments in divorce decrees that follow a well-considered pattern of distribution. *Krage, supra.* The alimony award and the property division will be considered together in determining whether the trial court has abused its discretion. *Wallahan, supra.*

■ While SDCL 25-4-45.1 precludes the consideration of fault in a property division, fault is still considered in awarding alimony to either of the parties. *Hanks v. Hanks,* 296 N.W.2d 523 (S.D. 1980). Alimony awards are also based upon the respective financial conditions of the parties after the property division and the parties' standard of living. *Id.; Kittelson, supra; Guindon v. Guindon,* 256 N.W.2d 894 (S.D.1977).

■ The trial judge specifically found that Douglas had destroyed the marriage. He stated in his Findings of Fact:

> That, at all times during the marriage of the parties hereto, defendant has followed a course manifesting a complete lack of affection and concern for the Plaintiff, her happiness and welfare, and the welfare of the marriage union itself; that the Defendant is belligerent and argumentative toward the Plaintiff; and that as a result of such acts and omissions by the Defendant, as above set out, Defendant has caused Plaintiff grievous mental and physical suffering with the result that the purposes of the marriage union have been destroyed.

The trial court's Findings of Fact and Conclusions of Law indicate that the factors listed above for consideration in property divisions and alimony awards, including fault, were considered in the decision to award alimony. The amount of alimony awarded, $500 per month or $6,000 per year, when added to the annual property settlement payment of $11,750, provides Judith an annual income of $17,750. This amount is not exorbitant, nor an abuse of the trial court's discretion.

The record is clear that Judith contributed as a homemaker and mother during twenty-two years of marriage, she dropped out of high school as a result of the marriage, all income she earned outside the home went toward the family, and she contributed to the growth of the family ranch operation for twenty-two years.

> While it is true that '[a]limony will not be awarded in such an amount as would allow a wife capable of work to sit in idleness,' . . . it is equally true that alimony 'will [not] be denied merely because she may be able to obtain employment and support herself.'

*Wallahan,* 284 N.W.2d at 27 (citation omitted) (brackets in original). The trial court properly considered Judith's lack of education and the probability that she will not earn above the minimum wage. Considering the evidence as a whole, there was no abuse of discretion in the property division or the alimony award.

Finally, Douglas questions the trial court's award of attorney fees. SDCL 15–17–7 permits the award of attorney fees in divorce cases. Each case rests on its own facts and there is nothing to be gained by comparing situations. This decision is also within the trial court's discretion. *Lien v. Lien,* 278 N.W.2d 436 (S.D.1979). On review, this court will examine the trial court's consideration of the elements involved in fixing legal fees generally: (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draft pleadings and try the case, (5) the discovery procedures utilized, (6) the existence of complicated legal problems, (7) the time required, (8) whether briefs were required, and (9) whether an appeal to this court is involved. *Id.; Holforty v. Holforty,* 272 N.W.2d 810 (S.D.1978).

In this case the assets, business dealings, and financial information involved were extensive. The record fills a 3′ × 2′ × 1½′ box. Depositions were taken, the case was tried and then appealed to this court. At the circuit court level there were temporary restraining orders, orders to show cause, and several pretrial hearings based upon affidavits and motions. The attorneys furnished itemized statements outlining the time spent on this case.

In making this determination [to award attorney fees], the trial judge should consider the property owned by each party; their relative incomes, *Jameson v. Jameson* (S.D.1976), [90 S.D. 179] 239 N.W.2d 5; whether the wife's property is in liquid or fixed assets, *Iverson v. Iverson* (S.D.1976), [90 S.D. 374] 241 N.W.2d 583; whether the actions of the wife increased unreasonably the time spent on the case, *DeWitt v. DeWitt,* [86 S.D. 59, 191 N.W.2d 177 (1971)]; and whether the actions of the husband increased unreasonably the time spent on the case, *Rock v. Rock,* 89 S.D. 583, 236 N.W.2d 191 (1975).

*Lien,* 278 N.W.2d at 443.

Considering these factors in relation to this action and to these parties, we find no abuse of discretion in the trial court's determination that Douglas should pay Judith's attorney fees.

We affirm.

FOSHEIM, C.J., WOLLMAN, J., and DUNN, Retired Justice, concur.

HENDERSON, J., dissents.

WUEST, Circuit Judge, Acting as a Supreme Court Justice, not participating.

HENDERSON, Justice (dissenting).

## ATTORNEY'S FEES

An award of attorney's fees in this case is preposterous under the facts and settled law of this state. Judith Temple departed from Douglas Temple with some $30,000 by lifting money from a joint account; she received $75,000 of a $310,000 property award via the decree. It appears that Douglas Temple has far less liquidity than Judith Temple. She is 38 years of age and has a steady job as a dietician's aide. She is in excellent health. The children born as issue of this marriage are adults and not dependent upon her for support. In *Gross v. Gross,* 355 N.W.2d 4, 9 (S.D.1984) (written by the same author as the majority opinion), this Court stated:

Allowance of attorney fees in a divorce action rests with the sound discretion of the trial court and will not be disturbed on appeal unless that discretion has been abused. SDCL 15–17–7; *Jameson [v. Jameson,* 90 S.D. 179, 239 N.W.2d 5 (1976)]. The award depends on the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case. *Barrett [v. Barrett,* 308 N.W.2d 884 (S.D. 1981)]; *Senger v. Senger,* 308 N.W.2d 395 (S.D.1981).

It is obvious from the language of *Gross* that the liquidity of a party and the parties' assets, have a great bearing upon an award of attorney's fees as it directly reflects upon the *ability* to pay. Here, with good health, a job, and $105,000, Judith Temple

has the ability to pay her own attorney's fees. Only sympathy and sentiment can engender an award for attorney's fees in the amount of $9,134. We are not here to dispute the reasonableness of an award of $9,134 attorney's fees based upon the criteria which must be considered in setting an attorney's fee. The factors set forth in the majority opinion apply in establishing a reasonable fee. However, a first hurdle must be bridged before the criteria of reasonableness comes into play in fixing legal fees. The first hurdle is this: Ought Douglas Temple pay Judith Temple's attorney's fees when she is possessed of $105,000 and has more liquidity than her ex-husband? She is in a better financial position, with this huge sum of cash and a guaranteed yearly income of $35,000 (per this dissenter's arithmetic below), to defray her attorney's fees from her own pocket and estate than to require her ex-husband to pay same. Therefore, I take the position that there was an abuse of discretion. An "abuse of discretion" refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981). As the evidence is unchallenged that she lifted $30,000 in cold cash from a joint account and received $75,000 in an alimony award, and will have a handsome income each year, it is clearly against reason and evidence that her ex-husband pay some $9,000 in attorney's fees. The trial court's discretion is not uncontrolled. Were it so, appellate courts would have no reason for existence.

## ALIMONY AWARD

Conceding that the lone cry of dissent from the hinterlands on property award is, like the wind, heard but unseen, and that the award will be affirmed, an alimony award herein is unnecessary. For, surely, with $30,000 in pocket, appropriated from a joint account and unaccounted for, and an award of $310,000 ($75,000 already paid thereunder) payable to Judith Temple in equal annual installments for twenty years at ten percent interest, she shall not want for the necessities of life or become a pub-

lic charge unless she fritters away her property award. If my arithmetic serves me correctly, as an example, the interest on $235,000 for the first year equals an additional $23,500. Interest commenced on March 4, 1983. One would have to be myopic and oblivious to hard-core finance, to not consider this in determining whether alimony should be awarded in the first instance.

This dissenter has sharply departed from the views of his Brothers on this Court on the subject of alimony. *See Connelly v. Connelly*, 362 N.W.2d 91, 92 (S.D.1985) (Henderson, J., dissenting), and *Martin v. Martin*, 358 N.W.2d 793, 800 (S.D.1984) (Henderson, J., concurring in part, dissenting in part). As I expressed in *Martin*, 358 N.W.2d at 803:

In the days of repeated pronouncement and demands for equality and independence of the sexes, it would appear that the State of South Dakota has veered sharply into a column of the liberalization of alimony. Historically, this would appear to be a paradox. (Footnote omitted.)

We see another extension of alimony liberalization, not only in *Connelly*, but also in the case at hand. We have apparently approached a mental state where we harbor an overly protective attitude toward prayers for and awards of alimony, thereafter approving of same, predicated upon a punishment of the male specie and as a gift for establishing economic stability. This decision, in my opinion, flies in the face of *Krage v. Krage*, 329 N.W.2d 878 (S.D.1983) (written by the same author as the majority opinion). In several recent writings, I have attempted to uphold the precedent of *Krage*, not only in dissent but in a majority opinion which I wrote for this Court, namely, *Goehry v. Goehry*, 354 N.W.2d 192 (S.D. 1984). In *Goehry*, 354 N.W.2d at 194, with emphasis, it is written: "The trial court's award of alimony and the division of property *are considered together* on appeal to determine whether the trial court abused its discretion. *Krage v. Krage*, 329 N.W.2d 878, 879 (S.D.1983) (emphasis sup-

plied)...." In *Goehry,* 354 N.W.2d at 194, we stated:

In *Krage,* this Court listed an additional consideration for alimony, for we declared: "In addition to the factors considered in making a property division, an alimony award is also based upon the respective financial conditions of the parties after the property division and their standard of living." 329 N.W.2d at 879.

In *Krage,* the parties were also involved in a ranching operation. The wife in that case received a cash award of $272,000. Here, her award is $310,000 (plus $30,000 taken and unaccounted for).[1] In *Krage,* no award of alimony was made to her because of the substantial property award which she had received and due to the restricted cash flow available in the ranching operation. Upon appeal, this very Court held that the lower court had not abused its discretion in refusing the wife's request for alimony. *Krage* is most applicable to the case before us. Here, we have a ranching operation; also, we likewise have a restricted cash flow by the husband (his income for the past four years reveals a net per year of $22,000 before depreciation and before income tax). In studying this record and the income tax returns, as well as the accompanying exhibits, it appears that Douglas Temple is financially unable to pay the $500 monthly alimony award and to simultaneously defray the substantial property settlement award which was granted below. The lower court and this Court have a duty to consider the respective financial conditions of the parties after the property division. In my opinion, this has not been done. As a student of the law, I cannot square our decision in *Krage* with the majority decision. If we assume that this 38-year-old woman will be awarded the sum of approximately $35,000 per year in principal and interest, it becomes obvious that an alimony award of $500 per month is unnecessary. In *Krage,* the "standard of living" was a factor to be considered. The standard of living for this couple was that of a young ranch couple, initially living in a house which had no running water. Their life-style was very hard and crude to begin with; only after the installation of plumbing and running water and the addition of a bathroom, did the parties begin to enjoy a modest life-style. In the first few years of the marriage, the parties did not have electricity. Both parties worked, Douglas Temple as a ranch hand, and Judith Temple as a mother raising children. The home in which they lived increased in value by $10,000 in improvements; the latter is another aspect of this appeal, which I shall not address in detail, but it all demonstrates that the standard of living for this young couple was very modest. There was no entertaining and apparently one vacation taken during the entire marriage. From sunup to sundown, it was raising children, wrangling cattle, and living the hard but rewarding life of a young ranching couple under the skies of Western South Dakota. Were it not for this extremely handsome property award, I could agree to an alimony award which would permit Judith Temple some dignity. However, when it appears that she will be the recipient of cash payments of some $35,000 per year, and given the entire circumstances of this case, I cannot subscribe to an additional $500 per month alimony award. Therefore, under the dictates of *Krage,* and as later espoused in *Goehry,* I maintain that there has been an abuse of discretion. The trial court's discretion is a broad one but it is not so broad that it is uncontrolled. That is why we have appellate courts. It is axiomatic that the discretion exercised must be soundly and substantially based upon the evidence. *Owen v. Owen,* 351 N.W.2d 139 (S.D.1984). In *Connelly,* 362 N.W.2d at 93, I pointed out where the power was given to the trial courts of this state to grant alimony, namely, SDCL 25-4-41; but I also pointed out that the Supreme Court of this state acts as a safety valve under SDCL 25-4-46, for it is provided therein: "[A]ll orders and decrees touching the alimony and maintenance of a

---

1. Per Finding of Fact 17, specific assets awarded to Judith Temple additionally granted her $16,- 194; this included $1,100 in cash and a 1981 Jeep valued at $8,900.

spouse ... are subject to revision on appeal in all particulars, including those which are stated to be in the discretion of the court." Therefore, it is the duty of this Court to revise when an inequity is decreed by the lower court. There are few of us in this world who have an income of $35,000 per year without lifting a finger in honest toil. To add a layer of $6,000 alimony atop of such an income, defies reason and the circumstances of this ranch couple. It can only retrogress this individual and inculcate within her a sense of false values. *See Connelly,* 362 N.W.2d at 93 (Henderson, J., dissent), trumpeting a warning of the creation of alimony drones in the U.S.A. This will approximate $41,000 per year and that is why the message of *Krage* and *Goehry,* that alimony and the division of property "are considered together" on appeal to determine whether the trial court abused its discretion, is a wise pronouncement.

## PROPERTY AWARD BASED ON INCONSISTENT FINDINGS

A mistake of monumental miscalculation has been committed by the lower court in property award. The majority opinion attempts to gloss it over by apparently taking the position that it is "almost impossible to distinguish individual marital property from Ranch property." This latter statement belies the exhibits on file in this case which were received in evidence and not objected to by Judith Temple. To understand this monumental miscalculation in law, it is necessary to appreciate some rather basic law concerning findings of fact and conclusions of law.

The standard and usual type of situation which confronts us at the appellate level is a determination of whether the trial court's findings of fact and conclusions of law are "clearly erroneous." Then, this Court invariably cites the rule announced in *In re Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). In this case, we have a different wrinkle and we must perceive some basic principles where there exists an inconsistency in findings of fact entered by a trial court. In this case, there can be no question that contradictory and inconsistent findings of fact were entered by the trial court which has precipitated a profound error which favors Judith Temple to such extent that the property award is sublime to her, rather than reasonable.

A reversal is necessitated when a judgment's validity and support is based on a particular finding which is contradicted by another finding on the same essential matter. *Balding v. Atchison, Topeka & Sante Fe,* 225 Cal.App.2d 254, 37 Cal.Rptr. 215 (1964); *Schaefer v. Berinstein,* 180 Cal. App.2d 107, 4 Cal.Rptr. 236 (1960); *American Nat'l Bank of San Francisco v. Donnellan,* 170 Cal. 9, 148 P. 188 (1915); 76 Am.Jur.2d *Trial* § 1260 (1975). "A judgment which rests on some particular finding for its validity and support may not be upheld where such finding is contradicted by another finding treating of the same essential matter." 76 Am.Jur.2d *Trial* § 1260, at 212 (1975). "It is also established, however, that when findings of fact by a trial court are either so inconsistent or so confusing, vague or indefinite that this court cannot determine the facts that the trial court intended to find, such findings are insufficient to support a judgment." *Hawkins v. Teeples & Thatcher, Inc.,* 267 Or. 151, 156–57, 515 P.2d 927, 931 (1973). A conclusion of law is like a house. Without a solid foundation, it tilts and will ultimately collapse. Findings of fact are the foundation for conclusions of law. When they are inconsistent and contradictory, the conclusion of law must necessarily be faulty. Now let us see what the trial court did here. The trial court found that Douglas Temple and his mother had an agreement whereby Douglas Temple was to receive 25% of the *profits* from the Pitchfork Ranch after 1972 which is totally inconsistent with the trial court's conclusion that he was to receive 25% of all of the *assets* of the Pitchfork Ranch. Finding of Fact 10 stated:

That in the early 1970's, Defendant and his mother reached an agreement whereby, for his services on the Pitchfork, Defendant would receive one-fourth

of the profits from Pitchfork operations and that Defendant was therefore to receive one-fourth interest in the value generated to the Pitchfork; that, during the course of time that followed, Defendant contributed substantially to the enhancement of Pitchfork assets and profits were plowed back into the accumulation of assets.

Douglas Temple does not challenge the accuracy of this finding, and in reading the record, I cannot see where it is repudiated by Judith Temple. The trial court proceeded to enter Finding of Fact 12 and set forth each and every asset of the Pitchfork Ranch, without any consideration of the source of these assets or their acquisition. Then, relying upon Finding of Fact 12, the court divided all of the property of the Pitchfork Ranch by virtue of the division of property set forth at Conclusion of Law 3. Moreover, Finding of Fact 15 is in direct conflict with Finding of Fact 10, for it holds that Douglas Temple has a 25% interest in all assets of the Pitchfork Ranch operations:

> In the foregoing facts and circumstances above found, the Court further finds that the Defendant has an ownership of twenty-five percent (25%) of all assets in the Pitchfork Ranch operations, reduced by twenty-five percent (25%) of Pitchfork liabilities, all as generally found in Findings [12] and [13], which amount is to be added to the net value of the net marital estate as found in Finding [14].

There is no doubt that the trial court could adjudicate that Judith Temple was entitled to a percentage of a one-fourth interest of the profits from the Pitchfork operations; there is no doubt that Douglas Temple was entitled to receive a one-fourth interest, from and after the early 1970's, of the value generated to the Pitchfork Ranch by those profits; and there is no question that these profits were plowed back into the accumulation of assets which contributed to the Pitchfork Ranch. Douglas Temple was entitled to 25% of the assets that 25% of the profits triggered. But to permit a sharing by Douglas Temple and Judith Temple to 100% of the assets of the Pitchfork Ranch is wrong. As I earlier expressed, assets before and after the 1972 agreement between mother and son, were broken down and put into this record as exhibits. Judith Temple is certainly entitled to a share of that 25%, but it must be limited to 25% of the profits and 25% of the assets that those profits created from and after 1972. Testimony all centered at the year of 1972 for the agreement between mother and son. As it now stands, the trial court included everything, that is to say, all land, livestock, machinery, buildings, vehicles, trailers, brands, and checking account of the Pitchfork Ranch.

Allen Temple, father of Douglas Temple, died in November 1961. His estate was probated in 1963. Nearly all of the property that Allen Temple owned when he passed on was in joint tenancy with his wife, Georgiana. This is reflected by Exhibit A in this file which also includes a final decree and the estate tax returns. All machinery, cash, and livestock passed directly to the widow outside of the estate. It was a handsome estate (example: $122,000 cash on deposit), and as reflected, there was a total joint tenancy ownership of $259,710 in assets. Douglas Temple and his mother each received $13,515 from the father's estate proper. The joint tenancy property included assets of the Pitchfork Ranch. At the conclusion of the estate proceedings, Douglas Temple's mother, the widow, owned 95% of all assets previously owned by her and her husband. Douglas Temple began to receive a salary in May 1960 of $125 per month and was allowed additional benefits, which included building up a small cattle herd of his own. With his inheritance in 1963 of $13,515, he began to build up his own estate. But it was not until 1972 that any agreement was struck wherein and whereby he was to receive any profits from the Pitchfork Ranch per se. In addition to the above, the mother of Douglas Temple owned land that she had inherited from her family in her own right and acquired another ranch called the "Cook Place." Douglas Temple, at that

time, absolutely had no interest in those assets and properties. In fact, the house where Judith and Douglas Temple raised their family is situated on the Cook Place and is actually owned by the mother as well as the ground underneath it. As meager as it was, Douglas and Judith Temple lived in it without paying rent. The family meat was raised on Pitchfork Ranch land. I do not disfavor an award in cash of an equity created by way of improvements in this house unto Judith Temple. To my way of thinking, she would be limited to an award within a 25% profits factor. This is based upon an assumption that profits, under the 25% agreement, when placed back into the house, would entitle Douglas Temple to a 25% increased value to the house per Finding of Fact 10. In 1972, Douglas Temple attempted on many occasions to have his mother enter into a formal partnership agreement. She adamantly refused because of adverse feelings towards Judith Temple and because of a previous ranch partnership which was dissolved with bitter feelings. What right, then, does a court of law have to create a partnership of a far greater magnitude when the principal capital contributor/owner refuses to enter into the partnership? Ultimately, she consented that 25% of the Pitchfork Ranch profits become the property of her son, Douglas Temple. The Pitchfork Ranch brands were transferred to both the mother and son with the express understanding that the son did not own one-half of the cattle nor own them in joint tenancy. It was done for convenience in making out bills of sale and the South Dakota State Brand Board was expressly notified in writing. Such notification evinces an absolute declaration of ownership other than joint tenancy. For a trial judge to then include all 2,200 head of livestock owned by the mother in the Pitchfork Ranch assets and to permit the son to have a 25% interest in all of these cattle, is wrong. This totals over three-quarters of a million dollars in value. It does injury to the agreement; it does injury to the ownership rights of the mother in the cattle; it does injury to a lifetime of work by the mother to build up

that tremendous herd of cattle working at the side of her husband; in law, it does violence to Finding of Fact 10. To then permit Judith Temple to have a percentage of 25% of the entire herd of cattle is a wrong of monumental miscalculation. Not one cow nor heifer nor bull of the Pitchfork Ranch belonged to Douglas Temple when his father died. Those cattle belonged in joint tenancy to Douglas Temple's mother and deceased father. It was so decreed in law. Douglas Temple did own some cattle in his own right, when his father died. Douglas Temple's holding in land, when his father died, was 480 acres of land valued at $4,800.

It is true that Pitchfork Ranch profits were used to purchase additional land in the name of Douglas Temple and his mother from and after 1972. Per the agreement and as established by Finding of Fact 10, Douglas Temple is entitled to 25% of the profits from the Pitchfork Ranch operations, including 25% of the land value generated by purchase from the Pitchfork Ranch profits.

It appears that Georgiana Temple drew out some $6,000 per year for her own individual living expenses from the Pitchfork Ranch operation. This was considerably less than Douglas and Judith Temple drew in various benefits and cash. Douglas Temple was not only withdrawing all of his personal expenses, but he was individually building up his private operations, outside of the Pitchfork Ranch, and these grew considerably, in ranch assets such as livestock, cash, machinery, vehicles, and equipment. The reader must understand that Judith Temple was also awarded a share of these holdings and there appears to be no objection to such an award/sharing concept. Further, I do not question for a moment that the trial court could act on those individually owned entities, whether cattle or land, which Douglas Temple acquired. To put it another way, the defendant acquired substantial personal assets during the course of his marriage and the inclusion of these assets to be distributed is legitimate.

Conclusions of Law 3 and 4 establish a division of assets to Douglas Temple that Douglas Temple has no equity in under Finding of Fact 12, said finding being a recitation of *all* Pitchfork Ranch assets. Finding of Fact 17 sets forth $16,194 in personal property to be awarded to Judith Temple and reflects that Douglas Temple should pay Judith Temple $310,000. Finding of Fact 17, in effect, arrives at a division of property based upon all of the assets of the Pitchfork Ranch as set forth in Finding of Fact 12.

I would reverse because Finding of Fact 12 totally ignores the mother's lifetime capital contribution to the limited partnership; I would reverse because the division of property includes all of the assets of the Pitchfork Ranch, regardless of when the assets were acquired; I would reverse and remand with instructions that the trial court enter a finding setting forth the Pitchfork Ranch profits and assets acquired after 1972, in accordance with Finding of Fact 10, thereby requiring the trial court to modify the property award accordingly; I would reverse because the findings of fact are glaringly inconsistent within themselves and the ultimate conclusions of law. A careful reading of Finding of Fact 10 and Finding of Fact 15, set forth in extenso above, readily reveals an error of great magnitude in the lower court.

We have before us another divorce case which is of deep concern to these parties. This case, with the hundreds of others that pour into this Court, create the heaviest appellate workload in this Court's history.[2] This wordy dissent perhaps can be attacked for its undue consideration of the case at hand. I would, however, like to believe that the Bar of this state realize that, notwithstanding the staggering increase in the number of appeals, these cases shall receive careful review. In this vein, I close with these words:

A cause for deep concern about appellate justice is the run-away inflation in the volume of appeals. Most appellate courts are confronted with staggering increases in the number of persons seeking their attention. This creates powerful pressures to adopt assembly line methods of work; such methods undermine basic values, destroying the qualities of deliberateness and personal concern that are essential to appellate justice.

Professors Carrington, Meador, and Rosenberg, *Justice on Appeal*, preface at 5 (West Pub.Co.1976).

---

**2.** Per South Dakota Supreme Court Rule 85–8, adopted January 23, 1985 and effective April 1, 1985, this Court promulgated an appellate settlement conference; domestic relations cases are properly subject to this rule and settlement before a conferee. This is voluntary, however.