**Karel Anthony HANHART, Plaintiff and Appellant,**

v.

**Donna Rochelle HANHART, Defendant and Appellee.**

**No. 17996.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 10, 1993.

Decided June 16, 1993.

H.I. King of Tonner, Tobin and King, Aberdeen, for plaintiff and appellant.

Julie T. Lovrien, Aberdeen, for defendant and appellee.

WUEST, Justice.

Karel Anthony Hanhart (hereinafter "Father") appeals a judgment and decree of divorce which granted child custody to Donna Rochelle Hanhart (hereinafter "Mother"). We affirm.

## FACTS/PROCEDURAL HISTORY

Father and Mother were married in 1976 and had three children: Liesl (DOB: 8/31/80); Melissa (DOB: 5/10/82); and, Michael (DOB: 7/28/83). A fourth child (Nathan (DOB: 8/8/90)) was born during this marriage but is not Father's biological son.

Father has worked for Shopko for approximately four years. He has traditionally worked approximately 60–65 hours per week. It is Shopko's standard policy that employees move every two to three years. However, there was testimony that Father may apply to be a "resident area manager" which would enable him to stay indefinitely in one location. Mother is a music teacher and has worked part-time over the last several years.

On November 1, 1990, Father filed for divorce on the grounds of extreme mental cruelty and alleged Mother was openly carrying on an adulterous relationship with the next-door neighbor, Robert Rochelle. The trial court entered a temporary order granting Father custody of the three eldest children. Nathan remained with Mother because he was still being breast fed. Mother answered Father's complaint, denied Father's allegations of adultery, alleged extreme mental cruelty, and requested custody of all four children.

At trial, Mother denied having sexual contact with Robert Rochelle during her marriage with Father, although she admitted having sexual contact with him during her separation from Father. The trial court held a full evidentiary hearing and then determined it was in the best interests of the children for Mother to have custody. Father was given liberal visitation rights. Father appealed to this Court.

During the pendency of that appeal, Mother admitted committing adultery during their marriage and told Father Nathan was not his biological son. Blood tests confirmed that Father is not Nathan's biological father. At Father's request, this Court remanded jurisdiction to the trial court so as to present this newly discovered evidence.

The trial court held a second trial. The evidence at the second trial was essentially the same as at the first trial except Mother admitted she lied at the first trial about committing adultery. The trial court reinterviewed the children and found them better adjusted and more outgoing after being in Mother's custody. The trial court issued a new divorce decree again giving Mother custody. Father requested attorney's fees ($2,565.00) for the costs of the second trial. The trial court awarded Father $750.00 in attorney's fees. Father appeals.

## DECISION

The facts of this case are essentially undisputed. Father has not alleged the trial court was clearly erroneous in any of its findings of fact. Therefore, the main issue is whether the trial court abused its discretion in concluding it was in the best interests of the children for Mother to have custody.

The trial court considered each of Father's arguments and concluded, in a well-reasoned decision, that the best interests of the children would be served by giving Mother custody, with liberal visitation by Father. A trial court's decision on a custody question will only be reversed if there was a clear showing of an abuse of discretion. *Anderson v. Anderson*, 472 N.W.2d 519 (S.D.1991). The following factors support the trial court's decision.

1. Fault is not considered in determining custody, except to the extent it is relevant to prove unfitness of the parent. SDCL 25-4-45.1. *Hanks v. Hanks,* 296 N.W.2d 523 (S.D.1980) (marital misconduct does not necessarily render a parent unfit). Although Mother had committed adultery, the trial court did not find her affair had any detrimental impact on the children. *See Adam v. Adam,* 436 N.W.2d 266 (S.D.1989) (misconduct harmful to children can be considered). Liesl, the eldest daughter, told Judge Gilbertson she saw Mother kiss Bob Rochelle once. Otherwise, there was no evidence the children were aware of Mother's extramarital affair.

2. Siblings should not be split unless there are "compelling circumstances." *Mayer v. Mayer,* 397 N.W.2d 638 (S.D.1986). Nathan is an infant and is not Father's biological son. It appears Father did not seek custody of Nathan after this was discovered. There was significant evidence that all four children are bonded and love one another.

3. Frequent moves and transient lifestyles are not in children's best interests. *Jasper v. Jasper,* 351 N.W.2d 114 (S.D.1984). Father's job requires him to work long hours and to move often. As a result, if Father had custody a significant amount of the children's day would be spent with a child care provider.

4. If Father was given custody he would have to expend a significant amount of money hiring child care providers. The trial court determined that would be an unnecessary strain on the limited finances available to this family.

5. The trial court interviewed the children and indicated that they were more outgoing and talkative than when Father had custody. Two of the three children interviewed indicated they wanted to live with Mother. The trial court specifically found the children had not been coached. In appropriate circumstances the choice of the children can be considered. *See Isaak v. Isaak,* 278 N.W.2d 445 (S.D. 1979).

The trial court had significant articulable reasons for granting custody to Mother.

The trial court's custody decision is affirmed. We have considered Father's other argument and find that the trial court did not abuse its discretion when it awarded him only $750 in attorney's fees. We deny Father's request for appellate attorney's fees.

MILLER, C.J., and SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

Appellant shall be referred to as Father; Appellee shall be referred to as Mother.

Father's brief, under issue 1, in block letters, expresses that the Findings of Fact were contrary to the best interests of the children and clearly erroneous and constitute an abuse of discretion. Throughout Father's opening brief and reply brief, he details the facts. In at least one place in the briefs, and during the discourse on the facts, he argues that the Findings of Fact are erroneous.

In the opening brief of Father and in his reply brief, there are numerous references to the first trial and the second trial, setting forth the transcript page and the volume. Majority opinion expresses that "Father has not alleged the trial court was clearly erroneous in any of its findings of fact." Wrong. Father's brief is preserved in this regard. He has urged the issue and he has recited the facts and bases his conclusion upon "an abuse of discretion" predicated upon the facts and precedent in this Court.

Mother is an adulteress having taken up a life of adultery with a neighbor across the street. Mother committed perjury in the first trial. A second trial was held because of her perjury at the first trial.

The neighbor, who sired an illegitimate child with Mother, during the course of her marriage to Father, has a record with several felony convictions. He is a multiple convict. Witnesses testified before the trial judge that he was abusive to his own wife, had a violent temper, and abused his children, inter alia, by using vulgar, filthy

language to them. Apparently, the trial judge paid no heed whatsoever to this testimony of independent witnesses. Mother described him, at the second trial, as being "quite a nice person, very compassionate and a good listener as well, but when pushed to the wall, he can be—can be hot tempered and he can also be somewhat rude." It is obvious that Mother has a poor value system.

Testimony reveals in this trial that Mother's adulterous relationship was such that neighbors saw him going in and out of the window, saw him partially unclad, and made no effort to hide his relationship from the children. It portrayed an immoral, unethical, and bad impression upon the children. The lovers were concerned with what the neighbors saw. Hence, the sneaking in and out of the window. But the neighbors saw. Mother not only committed adultery in this home, while Father worked, she also secretly discussed her relationship with the oldest girl. A child therapist testified that the conduct of the Mother, concerning her illicit relationship with the felon and the matters pertaining to the divorce, was very detrimental to the oldest girl and placed this young girl in the position of being a "parentified child." This therapist testified that this caused the young girl to take on an adult role, a role she was not equipped to handle. By taking the child into her confidence, this adulteress was trying to win the child over on her side. Trial judge had testimony before him that Mother's actions and deeds were contrary to the best interests of the children. At one time, the felon was released from jail and Mother had children prepare a bed for the felon in the basement of the family home. Society in this age—sinks deep and deeper. How can these children approach problems in life and try to solve them with any sense of pride and responsibility when adults set this kind of example?

There is no doubt in the wide, wide world that these children were openly exposed to this adulterous relationship. The children's therapist testified that this adulterous conduct, in their presence, harmed them. Notwithstanding, the trial judge opined it was in the best interests of the children to be with the Mother. The children's therapist, who worked with these children as the result of the Mother's terrible conduct, testified that the Father was a competent parent to have care, custody and control of these children.

It is obvious that the relationship between the Mother and the felon affected the children's development of what is right and wrong in this world. During the course of all of these proceedings, at one time Father had custody of these children, namely from January 1991, until on or about May 15, 1992. Teachers and witnesses came to the trial court and testified that the children were clean, well-dressed, well-nourished and were getting along in school and socially quite well. There is nothing to suggest that at any time the Father did not provide a stable and good environment for these children. With him, the children had positive experiences; with the Mother, the children had negative experiences. An example of this conclusion is illustrated in the transcript by the testimony of Karen Hanson, a neighbor. Ms. Hanson testified she saw the convict and adulteress Mother together frequently and listened to violent language of the convict. In the presence of his children, she heard him say: "... 'you fucking little sons of bitches'—that's what he (Bob Rochelle) said to his kids."

The record is replete with the fact that the Father is an extremely hardworking man who makes approximately $26,000 per year. He works approximately 45 to 55 hours per week. While he had temporary custody of the children, a next door neighbor, well known to the children, took care of the children and Father would pick them up at approximately 6:30 p.m. The children were in the care of the next door neighbor for approximately 3½ hours per day while Father was working.

An expert testified that the Father puts the needs of the children first. Further, he did not manipulate the children by saying terrible things about the Mother. Testimony reveals that the Mother talked against the Father to the children, ran him down, and discussed the problems of her mar-

riage. She had utter contempt for her husband. Obviously, this conduct emotionally tore the children apart. And testimony so established. In *Palmer v. Palmer*, 316 N.W.2d 631 (S.D.1982), we held that the trial court's findings reflected that the mother's utter contempt for the father may have, in some measure, have been transferred to the child. We held the trial court was justified in finding that she was a negative role model for a child. We held that the trial court did not abuse its discretion in awarding custody of the four year old daughter to the father. Here, this trial judge has clearly abused his discretion. A broad discretion is invested in our trial courts in awarding custody of children. However, upon a clear showing of an abuse of discretion, the Supreme Court should reverse the trial court. *Anderson v. Anderson*, 472 N.W.2d 519 (S.D.1991). Brothers and Sisters of the Law: Are we not committed to at least a two-tiered court system, so that a non-prevailing litigant has at least one chance for review of significant rulings at the trial court level? These incantations of abuse of discretion, where a single judge is vested with such type of power, is not limitless. Unreviewed discretion in the trial court is an offense to the fair administration of justice.

There is precedent in this Court to reverse this trial judge. He should be reversed. I vote to reverse. This trial judge abused his discretion in failing to consider the moral, temporal and emotional welfare of these children. Under our ruling in *Madson v. Madson*, 313 N.W.2d 42 (S.D. 1981), where there is a demonstrable effect upon a child because of adulterous conduct, the mother was deemed unfit to have custody. You will not read that case in the majority opinion. A harmful effect on a child will be considered because of marital misconduct. In a unanimous opinion, written by Justice Sabers, where there was circumstantial evidence of adultery by wife to grant divorce to the husband on grounds of adultery, we also held that awarding custody of a minor daughter to the father was justifiable for the child, inter alia, was exposed to an affair of the mother and another man. *Adam v. Adam*, 436 N.W.2d 266 (S.D.1989).

In my first year on this Court, I participated in the case of *Spaulding v. Spaulding*, 278 N.W.2d 639, 641 (S.D.1979). We held, inter alia, in *Spaulding* as follows:

When the mother, by irresponsible conduct, indicates that her care and custody would be detrimental to the welfare of the child, custody may be awarded to the father. *Hines v. Hines*, 78 S.D. 464, 104 N.W.2d 375 (1960); *Blow v. Lottman*, 75 S.D. 127, 59 N.W.2d 825 (1953); *Sweeney v. Joneson*, 75 S.D. 213, 63 N.W.2d 249 (1954).

You will not see that case cited either. Having been a member of the *Spaulding* court, I particularly remembered that case. *Madson* and *Adam* both followed the *Spaulding* decision.

SDCL 25–4–45.1 is authority for the Father's position, not the Mother's position, because her fault is relevant to the fitness of an award to the custody of these children.

Finally, I wish to express that there is nothing in this case to suggest that Father is anything but a dedicated and good father. Mother tried to alienate the children from Father, to the children's detriment. Again, in the case of *Nauman v. Nauman*, 445 N.W.2d 38, 39 (S.D.1989) this Court, in sustaining an award of custody to the father, addressed its disdain for a mother communicating hostile feelings to the children about their father; this Court would not tolerate such alienation of the children from the father for the reason that such hostility was not in the best interest of the children. So this Court has taken a consistent approach against adultery and marital misconduct as having a harmful effect on the child, particularly when it is displayed to the child. Likewise, this Court has taken a dim view of spawning hostility of a child against its father by a wayward mother. This type of judicial thought is obviously bottomed in the Christian–Judean culture. She caused these children to have a familial relationship with a felon, with whom she was having an affair. All of this is unnatural and wrong. To make a 12

year old girl a confidante to her corrupt life, in effect, warped and corrupted this young girl. Her parenting abilities are demonstrated by her conduct and these children should not be raised by a person who has revealed extreme character defects. The defects which I have described above go directly to her ability to develop these young children as responsible adults in their lifetime. Children must be taught to do the right thing, and not to condone the wrong thing, lest they become poor citizens of this Republic.

You need read no further than Hanhart v. Hanhart to understand and gain insight into the moral values of our homes and communities in today's history of our Republic. We read, see, hear, and witness the rising tide of alcohol abuse in our children, teenage violence, teenage pregnancy, and social misbehavior to an extent that traditional values in family life are destroyed. What kind of values did this mother impart to these children? In effect, she taught them to disregard basic values. She owed a duty to parentally assist them in their moral development. She violated that duty. Psychologist William Damon wrote a book called *Nurturing Children's Natural Moral Growth* (Free Press, New York, 1988–1989). In this book, he focuses on the moral development of children. Therein, he writes concerning (1) respect for authority (2) teaching respect (3) learning to be responsible and to be of service to others and (4) setting a good parental example. These children cannot draw meaning out of life, to be good citizens and parents of the future in this Republic, by being a part of profligate, adulterous, perjurious conduct of their mother, and to witness the ill-respect for the basic decency of life. Their respect for authority is destroyed.

Here, we maximize "discretion" and minimize justice. Accordingly, I dissent.